MICHAEL J. DAVIDSON (9445)
1126 West 700 North, Suite B
Lindon, UT 84042
Telephone: 844-600-7734 ext 104
Email: michael.davidson@psdi.com

*Attorney for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CELTIG, LLC, a Tennessee limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> AARON A. PATEY, an individual, EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; PSD INTERNATIONAL, LLC, a Utah limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware corporation. <br><br> Defendants. | **ANSWER, COUNTERCLAIM AND THIRD-PARTY COMPLAINT** <br><br> Case No.  2:17-CV-01086-JNP <br><br> Judge Jill N. Parrish |
| EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware corporation, <br><br> Counterclaimants, <br><br> vs. <br><br> CELTIG, LLC, a Tennessee limited liability company; <br><br> Counterdefendant, | |

EVERGREEN STRATEGIES, LLC, a Nevada
limited liability company; and RELAY
ADVANCED MATERIALS, INC., a Delaware
corporation,

                Third-party
                Plaintiffs,

    vs.

BRENT BENJAMIN WOODSON; PHILLIP
COX; MICHAEL GUNDERSON; TIBOR
KALNOKI-KIS; BRIAN EDWARDS; DAVID
NIELSON; DAVID WAITE; IMPEL SALES,
LLC, a Utah limited liability company; UTAH
LAKE LEGACY COALITION LLC, a Utah
limited liability company; Does 1 through 50;

                Third-Party
                Defendants.

Defendants AARON A. PATEY ("Mr. Patey"); EVERGREEN STRATEGIES, LLC, ("Evergreen"); PSD INTERNATIONAL, LLC, ("PSDI"); and RELAY ADVANCED MATERIALS, INC., ("RAM"), by and through counsel, answers the Plaintiff's Second Amended Complaint as follows:

## **PARTIES**

1.      These Defendants, answering Paragraph 1 of the Second Amended Complaint, are presently without sufficient information to form a belief as to the truth of the allegations contained within this paragraph and therefore deny the same.

2.      These Defendants, answering Paragraph 2 of the Second Amended Complaint, admit that Evergreen is a Nevada limited liability company but denies the remainder of the allegations contained therein.

3.      These Defendants, answering Paragraph 3 of the Second Amended Complaint, admit that RAM is a Delaware corporation but denies the remainder of the allegations contained therein.

4.      These Defendants, answering Paragraph 4 of the Second Amended Complaint, admit that PSDI is a Utah limited liability company with offices in Lindon, Utah, but denies the remainder of the allegations contained therein.

5.      These Defendants, answering Paragraph 5 of the Second Amended Complaint, admit that Mr. Patey is a resident of Utah.

6.      These Defendants, answering Paragraph 6 of the Second Amended Complaint, deny the allegations contained therein.

7.      These Defendants, answering Paragraph 7 of the Second Amended Complaint, deny the allegations contained therein.

## JURISDICTION AND VENUE

8.      These Defendants, answering Paragraph 8 of the Second Amended Complaint, are presently without sufficient information to form a belief as to the truth of the allegations related to the domicile or citizenship of the members of the Plaintiff and therefore deny the same.

9.      These Defendants, answering Paragraph 9 of the Second Amended Complaint, admit that the principle places of business for PSDI and RAM are located in Lindon, Utah and that Evergreen has consented to the personal jurisdiction of this Court.  These Defendants deny the remainder of the allegation in this paragraph.

10.     These Defendants, answering Paragraph 10 of the Second Amended Complaint, admit the allegations contained therein.

## GENERAL ALLEGATIONS

11.     These Defendants, answering Paragraph 11 of the Second Amended Complaint, is presently without sufficient information to form a belief as to the truth of the allegations contained within this paragraph and therefore denies the same.

12.     These Defendants, answering Paragraph 12 of the Second Amended Complaint, admit that a meeting occurred on or around January 3, 2017 but deny the remainder of the allegations contained therein.

13.     These Defendants, answering Paragraph 13 of the Second Amended Complaint, admit that Brian Edwards attended the meeting discussed in Paragraph 12.

14.     These Defendants, answering Paragraph 14 of the Second Amended Complaint,

15.     These Defendants, answering Paragraphs 15 to 18 of the Second Amended Complaint, deny the allegations contained therein.

16.     These Defendants, answering Paragraphs 19 to 22 of the Second Amended Complaint, admit that PSDI and Celtig executed an MOU, but states that the document speaks for itself and denies any allegations or implications not in harmony with the MOU.

17.     These Defendants, answering Paragraphs 23 to 33 of the Second Amended Complaint, admit that Evergreen and Celtig entered into the two agreements described and that the documents speak for themselves and therefore deny any allegations or implications not in harmony with those agreements.  These Defendants all note that a page is missing from the Definitive Agreement.

18.     These Defendants, answering Paragraphs 34 to 62 of the Second Amended Complaint, deny the allegations contained therein.

## FIRST CAUSE OF ACTION

19.     These Defendants, answering Paragraphs 63 to 68 of the Second Amended Complaint, deny the allegations contained therein.

## SECOND CAUSE OF ACTION

20.     These Defendants, answering Paragraphs 69 to 76 of the Second Amended Complaint, deny the allegations contained therein.

## THIRD CAUSE OF ACTION

21.     These Defendants, answering Paragraphs 77 to 89 of the Second Amended Complaint, deny the allegations contained therein.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

22.     These Defendants deny the allegations of the Second Amended Complaint, and each cause of action, and each paragraph in each cause of action, and each and every part thereof, including a denial that the Plaintiffs were damaged in the sum or sums alleged, or to be alleged, or any other sum or sums whatsoever.

## SECOND AFFIRMATIVE DEFENSE

23.     These Defendants deny that by reason of any act or omission, fault, conduct or liability on the part of these answering Defendants, whether negligent, careless, unlawful or whether as alleged, or otherwise, the Plaintiff was injured or damaged in any of the amounts alleged, or in any other manner or amount whatsoever; these answering Defendants further deny that these answering Defendants were negligent, careless, reckless, wanton, acted unlawfully or are liable, whether in the manner alleged or otherwise.

## THIRD AFFIRMATIVE DEFENSE

24.     These Defendants are informed and believe, and thereon alleges, that the Second Amended Complaint, and each and every cause of action stated therein, fails to state facts sufficient to constitute a cause of action, or any cause of action, as against these answering Defendants.

## FOURTH AFFIRMATIVE DEFENSE

25.     These Defendants are informed and believe, and thereon alleges, that the Second Amended Complaint is barred by issue preclusion and/or the Doctrine of Res Judicata.

## FIFTH AFFIRMATIVE DEFENSE

26.     These answering Defendants are informed and believe, and thereon alleges, that if the Plaintiff suffered or sustained any loss, injury, damage or detriment, the same is directly and proximately caused and contributed to, in whole or in part, by the breach of warranty, conduct, acts, omissions, activities, carelessness, recklessness, negligence, and/or intentional misconduct of

the Plaintiff, thereby completely or partially barring the Plaintiff's recovery herein.

## SIXTH AFFIRMATIVE DEFENSE

27.     These Defendants are informed and believe, and thereon alleges, that it is not legally responsible in any fashion with respect to the damages and injuries claimed by the Defendants; however, if these Defendants are subjected to any liability to the Plaintiff, it will be due, in whole or in part, to the breach of warranty, acts, omissions, activities, carelessness, recklessness, and negligence of others; wherefore any recovery obtained by the Plaintiff against these Defendants should be reduced in proportion to the respective negligence and fault and legal responsibility of all other parties, persons and entities, their agents, servants and employees who contributed to and/or caused any such injury and/or damages, in accordance with the law of comparative negligence; consequently, these Defendants are informed and believe, and thereon alleges, that the liability of these answering Defendants, if any, is limited in direct proportion to the percentage of fault actually attributed to these answering Defendants.

## SEVENTH AFFIRMATIVE DEFENSE

28.     If these Defendants are found responsible in damages to the Plaintiff or some other party, whether as alleged or otherwise, then these Defendants are informed and believe, and thereon alleges, that the liability will be predicated upon the active conduct of the Plaintiff, whether by negligence, breach of warranty, strict liability in tort or other-wise, which unlawful conduct proximately caused the alleged incident and that the Plaintiff's action against these Defendants are barred by that active and affirmative conduct.

## EIGHTH AFFIRMATIVE DEFENSE

29.     These answering Defendants are informed and believe, and thereon alleges, that at the time or place of the incidents alleged in the Second Amended Complaint, the Plaintiff knew of

and fully understood the danger and risk incident to its undertaking, but despite such knowledge, freely and voluntarily assumed and exposed themselves to all risk of harm and the consequent injuries and damages, if any, resulting therefrom.

## NINTH AFFIRMATIVE DEFENSE

30.     These Defendants are informed and believe, and thereon alleges, that as to each alleged cause of action, Plaintiff has failed, refused and neglected to take reasonable steps to mitigate their alleged damages, if any, thus barring or diminishing the Plaintiff's recovery herein.

## TENTH AFFIRMATIVE DEFENSE

31.     These Defendants are informed and believe, and thereon alleges, that the Defendants have failed to join all necessary and indispensable parties to this lawsuit.

## ELEVENTH AFFIRMATIVE DEFENSE

32.     These Defendants are informed and believe, and thereon alleges, that the injuries and damages of which the Plaintiff complaina were proximately caused by, or contributed to by, the acts of other Parties, persons, and/or other entities, and that said acts were an intervening and superseding cause of the injuries and damages, if any, of which the Plaintiff complains, thus barring the Plaintiff from any recovery against these answering Defendants.

## TWELFTH AFFIRMATIVE DEFENSE

33.     It has been necessary for these Defendants to retain the services of an attorney to defend this action, and these Defendants are entitled to a reasonable sum as and for attorneys' fees.

## THIRTEENTH AFFIRMATIVE DEFENSE

34.     These Defendants are informed and believe, and thereon alleges, that the claims of the Plaintiff are reduced, modified and/or barred by the Doctrine of Unclean Hands.

## FOURTEENTH AFFIRMATIVE DEFENSE

35.     These Defendants are informed and believe, and thereon alleges, that the Second Amended Complaint is reduced, modified, and/or barred because the Plaintiff received payment.

### FIFTEENTH AFFIRMATIVE DEFENSE

36.     These Defendants are informed and believe, and thereon alleges, that the Second Amended Complaint is reduced, modified, and/or barred because the Plaintiff abandoned their contract with these Defendants.

### SIXTEENTH AFFIRMATIVE DEFENSE

37.     Pursuant to F.R.C.P. 11, all possible affirmative defenses may not have been alleged herein insofar as sufficient facts were not available for these Defendants after reasonable inquiry, and therefore, these Defendants reserves the right to amend its Answer to alleged additional affirmative defenses, if subsequent investigation so warrants.

### PRAYER

WHEREFORE these answering Defendants prays for judgment against Plaintiff. as follows:

1.     That the Plaintiff take nothing by way of this action;

2.     For the cost of suit incurred herein;

3.     For attorneys' fees and costs; and

4.     For such other and further relief as the Court deems just and proper.


Respectfully submitted this 23rd day of October, 2017.

/s/ Michael J. Davidson
Michael J. Davidson
*Attorney for Defendants*

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Third Party Plaintiffs EVERGREEN STRATEGIES, LLC and RELAY ADVANCED MATERIALS, INC (referred to herein collectively as "Counterclaimants" or "Third Party Plaintiffs" or individually as "Evergreen" or "RAM") through their undersigned counsel, hereby complains of Plaintiff/Counterdefendant CELTIG, LLC ("Celtig") and Third-Party Defendants BRENT BENJAMIN WOODSON, PHILLIP COX, MICHAEL GUNDERSON, TIBOR KALNOKI-KIS, BRIAN EDWARDS, DAVID NIELSON, DAVID WAITE, IMPEL SALES, LLC, and UTAH LAKE LEGACY COALITION LLC (referred to herein as "Third-Party Defendants" or "Mr. Woodson," "Mr. Cox," "Mr. Gunderson," "Mr. Kalnoki-kis," "Mr. Edwards," Mr. Nielson," "Mr. Waite," "Impel," and "ULLC" respectively), as follows:

## NATURE OF ACTION

1.      Graphene is a unique substance that has not been easily or economically produced. Celtig has created a process which is alleged to be scalable and allows for the production of large quantities of graphene at a reasonable cost.  Evergreen entered into the agreements with Celtig primarily to supply itself with sufficient graphene to use in a variety of applications.  Because there is such a dearth of producers of graphene in the world, the agreements allowing for the purchase of graphene in bulk are of such a unique character that monetary damages are not adequate.

2.      Evergreen entered into two contracts with Celtig in March 2017.  Pursuant to these contracts, Evergreen was to purchase the total output from Celtig that met specified quality standards, while Celtig agreed that Evergreen would have a minority ownership stake in Celtig and that Evergreen would guarantee a generous profit margin for Celtig on all materials and products that Celtig produced. RAM is an affiliate of Evergreen and has been assigned certain duties and benefits under the contracts.

3.      Celtig has committed multiple materials breaches of these contracts, as set forth more particularly herein, including an attempt to wrongfully terminate the contracts without cause and in contravention of the express terms of each. The immediate economic harm incurred by Evergreen and RAM due to these breaches exceed half a billion dollars.

4.      Meanwhile, Mr. Woodson, Mr. Cox, Mr. Gunderson, Mr. Kalnoki-kes, Mr. Edwards, Mr. Nielson, Mr. Waite, Impel and ULLC (the "Conspirators") have engaged in a civil conspiracy to intentionally interfere with the economic relations between Evergreen and Celtig, to the detriment of Evergreen and Celtig, and the economic relations between Evergreen and RAM on the one hand and the existing and potential investors and clients of Evergreen and RAM on the other.  They have conspired to cause Celtig to wrongfully attempt to terminate the contracts and have further conspired to damage Evergreen and RAM's relationships with potential partners in further the program outlined in the contracts.

5.      Through a tortious conspiracy, various breaches of contracts, and the breaches of other duties, the Third Party Defendants have severely harmed Evergreen and RAM in an amount to be proven at trial, but which conservatively exceeds $5 billion dollars.

## DESCRIPTION OF THE PARTIES

6.      Evergreen is a Nevada limited liability company with offices in Utah County, Utah.

7.      RAM is a Delaware corporation with offices at 1126 West 700 North, Suite B, Lindon, UT 84042 in Utah County, Utah. Its principal place of business is in Lindon, Utah.  RAM was formed for the purpose of purchasing product from Celtig and marketing that product to a worldwide market.

8.      Upon information and belief, Celtig is a Tennessee limit liability company with an office at 927 Gothic Manor Way, Knoxville, TN. Celtig manufactures graphene through a proprietary process.

9.      Upon information and belief, Mr. Woodson, is an individual residing in Utah County, Utah.  Mr. Woodson was an employee of RAM, working in the Lindon office of RAM,

from April 3, 2017 to September 13, 2017.  Mr. Woodson, at all times relevant to this action, has been under a *Confidentiality Agreement*, dated April 6, 2017 (the "Woodson Agreement"), with RAM that forbids many of his activities complained about herein.

10.     Upon information and belief, Defendant Mr. Cox, is an individual residing in Salt Lake County, Utah.  Mr. Cox, at all times relevant to this action, has been an officer or member of Impel and subject to the duties and obligations under the Impel Agreement (defined below) in addition to the tortious conduct complained of herein.

11.     Upon information and belief, Defendant Mr. Gunderson, is an individual residing in Salt Lake County, Utah.  Mr. Gunderson, at all times relevant to this action, has been an officer or member of Impel and subject to the duties and obligations under the Impel Agreement (defined below) in addition to the tortious conduct complained of herein.

12.     Upon information and belief, Defendant Mr. Kalnoki-kes, is an individual residing in Ohio.  Mr. Kalnoki-kes was an employee of RAM, working in the Lindon office of RAM.  Mr. Kalnoki-kes, at all times relevant to this action, has been under a *Confidentiality Agreement*, on or about March 2017 (the "Kalnoki-kes Agreement"), with RAM that forbids many of his activities complained about herein.

13.     Upon information and belief, Defendant Mr. Edwards, is an individual residing in Tennessee.  Mr. Edwards was the CEO of Certig at all relevant times and was bound by the terms of the agreements between Evergreen and Celtig in his official capacity.   Additionally, Mr. Edwards acted in his individual capacity in furtherance of the common scheme to commit the tortious and contractual breaches as set forth herein.

14.     Upon information and belief, Defendant Mr. Nielson, is an individual residing in Utah County, Utah.  Mr. Nielson was an employee of RAM, working in the Lindon office of RAM.  Mr. Nielson, at all times relevant to this action, has been under a *Confidentiality Agreement*, dated January 2017 (the "Nielson Agreement"), with RAM that forbids many of his activities complained about herein.

15.     Upon information and belief, Defendant Mr. Waite, is an individual residing in Utah County, Utah.  Mr. Waite was an employee of RAM, working in the Lindon office of RAM. Mr. Waite, at all times relevant to this action, has been under a *Confidentiality Agreement*, dated June13, 2017 (the "Waite Agreement"), with RAM that forbids many of his activities complained about herein.  The Woodson Agreement, Kalnoki-kes Agreement, Nielson Agreement and Waite Agreement and substantially identical in their terms and conditions, and are collectively referred to as the Employment Agreements.

16.     Upon information and belief, Impel is a Utah limited liability company with an office at 510 South 200 West, Suite 200, Salt Lake City, UT 84101. Impel was formed on November 18, 2016.  Impel is owned and/or controlled by Mr. Cox. Impel entered into a certain agreement with Evergreen under which it undertook certain duties and responsibilities (the "Impel Agreement").

17.     The Third-Party Defendants, individually and collectively, as a result of the tortious interference and contractual breaches set forth in this Counterclaim and Third-Part Complaint are liable to Evergreen and RAM for all or any part of the claims brought be Celtig in the Second Amended Complaint.

18.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Evergreen or RAM, who therefore sues said Third Party Defendants by such fictitious names. Evergreen and RAM are informed and believe and thereon alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein. Evergreen and RAM will ask leave of this Court to amend this pleading to insert their true names and capacities in place and instead of the fictitious names when the same become known.

19.      At all relevant times, Defendants and DOES 1 through 50, and each of them, were the agents, employees, joint venturers and/or joint tortfeasors of each other, and were at all times acting within the purpose and scope of said agency, employment, and/or joint venture, and each of

Defendants and DOES 1 through 50 has ratified and approved the acts of its agent, employee, joint venture and/or joint joint tortfeasor.

## JURISDICTION, VENUE, AND DISCOVERY TIER

20.     This Court has subject matter jurisdiction over the counterclaim asserted against Celtig pursuant to 28 USCS § 1332 as set forth in the Second Amended Complaint.

21.     This Court has subject matter jurisdiction over the dispute with the Third-Party Defendants pursuant to 28 USCS § 1367 and FRCP 14 because the claims against the Third-Party Defendants are so related to the claims in the Second Amended Complaint and this Counterclaim that they form part of the same case or controversy under Article III of the United States Constitution.

22.     This Court has personal jurisdiction over the Plaintiff and Defendants pursuant to the allegation in the Second Amended Complaint and on the Third-Party Defendants because the Third-Party Plaintiffs have principle places of business in the State of Utah and the Third-Party Plaintiffs have suffered tortious injury caused by the Third-Party Defendants pursuant to Utah Code § 78B-3-205(3) and/or has contracted to supply goods or services in this state pursuant to Utah Code § 78B-3-205(2).

23.     Venue properly lies in this Court pursuant to 28 USCS § 1391 because a substantial part of the events giving rise to the claims occurred in this juridical district, and the Third-Party Defendants are subject to personal jurisdiction in this judicial district.

## THE DEFINITIVE AGREEMENT

24.     In late 2016, Mr. Cox approached Mr. Patey seeking to secure an investment in Celtig. Discussions commenced amongst the various parties, and a Memorandum of Understanding regarding the proposed business arrangement amongst Evergreen, Celtig, Impel and others was formalized on January 23, 2017.

25.     On or about March 28, 2017, the business arrangement between Evergreen and Celtig was formalized in two agreements, the *Definitive Agreement* and the *Exclusive License and Distribution Agreement* (the "Definitive Agreement" and the "Licensing Agreement," collectively the "Celtig Agreements").

26.     The Celtig Agreements, along with side agreements executed with various parties, superseded all previous agreements and understandings amongst the various parties.  In particular, the preexisting Referral Fee Agreement between Celtig and Impel was assigned to Evergreen, and Evergreen and Impel entered into an Agreement to formalize the relationship between Impel and Evergreen (the "Impel Agreement"). The Impel Agreement was executed concurrently with the Celtig Agreements.

27.     Section 1 of the Definitive Agreement called for Evergreen to make an advanced payment of "$750,015.00 for the purchase of an estimated 833,350 grams of Graphene from Celtig within 3 business days following the execution of [the Definitive Agreement]" (the "Section 1 Graphene").

28.     Evergreen insisted on Celtig producing the Section 1 Graphene as a test run to verify that Celtig was indeed capable of producing a large quantity of graphene that met the necessary quality standards at the outset of the Agreement.

29.     Evergreen made the payment required by Section 1 of the Definitive Agreement in the time required, but Celtig has failed to deliver the Section 1 Graphene, despite already having received payment from  Evergreen for the same.  This constitutes a material breach of the Definitive Agreement.

30.     Upon information and belief, Celtig refused to deliver the Section 1 Graphene due to a failure by Celtig to produce graphene to the quality and purity standards agreed between the Celtig and Evergreen. Mr. Cox had informed employees of the Evergreen and RAM that the undelivered graphene has failed to meet the production quality standards and was only produced by Celtig in part.

31.     The failure of Celtig to produce the already paid for Section 1 Graphene has resulted in significant contractual damages in an amount to be determined at trial, but which are in excess of $500,000,000.00.

32.     Upon information and belief, the failure of Celtig to make the Section 1 Graphene available to Evergreen is a result of the concerted actions of the Conspirators.  The Conspirators, including those that were employed by RAM at the time, decided to mischaracterize the requirements of Section 1 of the Definitive Agreement in order to make it appear that the Advance Payment was for some graphene to be produced later, and that the Section 1 Graphene needed to be paid for again before Celtig would make it available to delivery or testing, thereby making it appear that Evergreen was in breach of the Definitive Agreement for failing to pay for the Section 1 Graphene twice.

33.     Nearly all of the communications discussed in the Second Amended Complaint were between one or more of the Conspirators, and were made for the purpose of attempting to manufacture a breach by Evergreen that didn't exist in reality.

34.     Sections 2 and 4 of the Definitive Agreement required Celtig to amend its Operating Agreement to recognize Evergreen as a 30% owner of Celtig and to give Celtig appropriate seats on its board in recognition of this fact upon the payment by Evergreen of the Advanced Payment for the Section 1 Graphene.  Celtig has not complied with the requirements of this section of the Definitive Agreement.

35.     Celtig admits in the Second Amended Complaint that it has not complied with the requirements of Sections 2 and 4 of the Definitive Agreement.

36.     The failure of Celtig to comply with the conditions and promises in Sections 2 and 4 of the Operating Agreement is a material breach of the Definitive Agreement and has resulted in significant damages to Evergreen, in an amount to be determined at trial.

37.     Subsequent to the production and delivery of Section 1 Graphene meeting the agreed quality standard, Evergreen had a three-year purchase commitment outlined in Section 5.  The three year period contemplated therein wouldn't commence until Celtig was producing two metric tons

of graphene per month that met the quality standards specified in a facility that was ISO 9001 certified.  As the Section 1 Graphene has not been made available to Evergreen, and Evergreen has not even been able to verify that it met the required quality standard, purchases under Section 5 have not commenced.

38.     The failure of Celtig to work toward an ISO 9001 facility for the production of graphene constitutes a material breach of the Definitive Agreement.

39.     Section 5 of the Definitive Agreement requires Celtig to work with Evergreen to obtain the commitment that a facility in China controlled by a company called Sinagraphene will appoint Evergreen or one of its assigns to manage the management, sales, contract negotiations and representation of the products produced by Sinagraphene in the same manner as contemplated in the Celitg Agreements.

40.     Celitg's breach of Section 5 of the Definitive Agreement is a material breach of the Definitive Agreement and has resulted in significant damages to Evergreen.

41.     Section 6 of the Definitive Agreement requires Celtig to notify Evergreen of any existing or new relationships Celtig has or may develop with any organizations, companies or individuals which show an interest in purchasing or developing applications for graphene.  This section requires that Evergreen would take the lead in any and all negotiations and contracts (with the cooperation and participation of Celtig).

42.     Upon information and belief, Celtig has breached the requirements of Section 6 of the Definitive Agreement by failing to disclose expressions of interest from multiple potential consumers of graphene, and by excluding Evergreen from negotiations and discussions with these parties. This is a material breach of the Definitive Agreement and Evergreen has suffered significant damages as a result.

43.     Section 7 of the Definitive Agreement requires Celtig to include Evergreen in all negotiations with Sinagraphene where graphene produced by Sinagraphene will be used to fulfill orders by Evergreen.

44.     Upon information and belief, a significant portion of the Section 1 Graphene was obtained from Sinagraphene rather than produced by Celtig.  Celtig did not involve Evergreen in the discussions with Sinagraphene for the brokering of this graphene that Evergreen expected would be produced entirely by Celtig.

45.     The failure of Celtig to involve Evergreen in these discussions with Sinagraphene is a material breach of the Definitive Agreement and Evergreen has suffered damages in an amount to be determined at trial.

46.     Upon information and belief, some or all of these breaches by Celtig are the result of the concerted action of some or all of the Conspirators.

47.     Celtig further violated the confidentiality provisions of the Celtig Agreements by disclosing confidential information to third parties without the consent of Evergreen and by sharing information with the Conspirators in contravention of Celtig's clear duties, as discussed below.

48.     Section 13 of the Definitive Agreement requires that the parties shall engage in non-binding mediation to resolve any dispute between them prior to litigation.  Celtig filed the instant case without engaging in or demanding mediation and has breached the Definitive Agreement thereby.

49.     Evergreen did not file any action against Celtig without first demanding mediation.

50.     Section 10 of the Definitive Agreement gives Celtig the authority to terminate the Definitive Agreement under two conditions.  The first condition would be a failure by Evergreen to pre-pay for the Section 1 Graphene.  As discussed above, Celtig has received this payment.

51.     The second condition under Section 10 of the Definitive Agreement that would allow Celtig to terminate the Definitive Agreement would be triggered if Celtig is able to "produce and be able to deliver Graphene in the volume and quality provided in paragraph 5 [of the Definitive Agreement] and should Evergreen be unable to purchase [the Graphene produced], Celtig may elect to terminate this Agreement."  However, Celtig has yet to produce and deliver the Section 1 Graphene as discussed above, much less those identified in paragraph 5 of the Definitive Agreement.

52.     There are no other provisions in the Definitive Agreement that would allow Celtig to unilaterally terminate the Definitive Agreement outside of these two conditions set forth above.

53.     By unilaterally attempting to terminate the Definitive Agreement without cause, Celtig has breached the same and is attempting to deprive Evergreen with the economic advantages incident thereto.

54.     Celtig's attempt to unilaterally terminate the Definitive Agreement without cause and failure to make the Section 1 Graphene available for inspection or delivery are evidences of bad faith, as are the other inexcusable breaches set forth herein.

55.     But for the tortious activities of the Conspirators, no attempt would have been made by Celtig to terminate the Definitive Agreement.

56.     Evergreen has complied in all material respects with its requirements under the Definitive Agreement.

## THE LICENSING AGREEMENT

57.     Section 1.a. of the License Agreement appointed Evergreen as the "exclusive distributor of Products [defined as any and all graphene, graphene products or graphene derivatives created through, or as a result of, the use of Celtig's Intellectual Property, specifically, its methods for producing Graphene]." Upon information and belief, Celtig has materially breached this Section of the Agreement by engaging in specific and direct negotiations with at least four third parties for the sale and distribution of graphene.

58.     Upon information and belief, Celtig has sold graphene to third parties in contravention of the Licensing Agreement. In doing so, Celtig has damaged Evergreen and RAM in an amount to be proven at trial.

59.     Evergreen and RAM have been hampered in their ability to perform their responsibilities under the Licensing Agreement due to Celtig's failure to complete the Section 1 Graphene order discussed above.

60.     Additionally, Celtig's website is and has been inconsistent with the terms and intent of Licensing Agreement.  On it, Celtig is offering information and sales of graphene to the public

rather than referring interested parties to Evergreen and RAM.  This constitutes a material breach of the Licensing Agreement.

61.     Section 4.b. of the Licensing Agreement allows for the termination of the Licensing Agreement (but not the Definitive Agreement) if the non-terminating party "fails to provide within fourteen (14) days after a request adequate and reasonable assurances of its financial and operational capability to perform timely any of its obligations under this Agreement."

62.     Celtig wrongfully attempted to unilaterally terminate the Licensing Agreement based on a perception that Evergreen didn't have the financial ability in August 2017 to immediately purchase $120,000,000.00 worth of graphene under the Definitive Agreement.  Celtig failed to ask Evergreen for assurances that it could perform the Licensing Agreement, and neither the Licensing Agreement nor the Definitive Agreement requires adequate assurances for with respect to performance under the Definitive Agreement.

63.     Upon information and belief, Mr. Cox drafted most or all of the communications sent from Celtig to Evergreen, including the so-called termination notice, furthering the aims of the Conspirators in their tortious conduct.

64.     Evergreen has complied in all material respects with its requirements under the Licensing Agreement.

## THE IMPEL AGREEMENT

65.     On or about March 28, 2017, Evergreen and Impel entered into an Agreement (the "Impel Agreement").

66.     Evergreen has complied in all material respects with its requirements under the Impel Agreement.

67.     Impel was required to keep certain information confidential and to not circumvent the Celtig Agreements.  Upon information and belief, Impel and its agents, including Mr. Cox, have violated these provisions in a material way by improperly contacting and soliciting the customers, potential customers, investors and potential investors of Evergreen.

## THE WOODSON AGREEMENT

68.     On or about April 3, 2017, RAM hired Mr. Woodson for the purpose of doing business development for RAM.  On April 6, 2017, Mr. Woodson executed a certain agreement requiring that he keep certain items confidential, refrain from developing competing business interests while employed by RAM and refrain from competing directly with RAM after his employment ended.

69.     Mr. Woodson has materially breached these obligations by developing a competing business interest while still employed by RAM, breaching his confidentiality obligations and by directly competing with RAM by contacting RAM's investors and customers in the hours and days following his termination.  Mr. Woodson further breached these agreements by appropriating for himself additional business opportunities beyond the Celtig Agreements.  Even after being warned, Mr. Woodson has continued to pursue this illegal and unethical course of action.

70.     On or about August 18, 2017, Mr. Woodson and Mr. Kalnoki-kes formed ULLC for the purpose of competing with RAM on projects that they had been pursuing while employees of RAM.  At the time, both Mr. Woodson and Mr. Kalnoki-kes were both full time employees of RAM and subject to the Woodson Agreement and the Kalnoki-kes Agreement.

71.     During this same time period, during business hours and in RAM's place of business, Mr. Woodson and Mr. Kalnoki-kes solicited other employees of RAM and related companies to join their new venture as employees to engage in activities adverse to RAM and Evergreen's interests and in violation of their respective employment agreements.

72.     Mr. Woodson has also retained in his possession and converted to his own use in furtherance of the tortious conspiracy set forth herein certain assets of RAM, including a laptop computer, paper files, electronic files and records, control of the relaycorp.com domain and the associated email database files and associated website assets.

73.     Additionally, Mr. Woodson used RAM related credit cards to make unauthorized personal purchases in an amount to be proven at trial.

## THE KALNOKI-KES AGREEMENT

74.     In March 2017, RAM hired Mr. Kalnoki-kes for the purpose of developing applications for graphene on behalf of RAM.  In March 2017, Mr. Kalnoki-kes executed a certain agreement requiring that he keep certain items confidential, refrain from developing competing business interests while employed by RAM and refrain from competing directly with RAM after his employment ended.

75.     Mr. Kalnoki-kes has materially breached these obligations by developing a competing business interest while still employed by RAM, breaching his confidentiality obligations and by directly competing with RAM by contacting RAM's investors and customers.  Mr. Kalnoki-kes further breached these agreements by appropriating for himself additional business opportunities beyond the Celtig Agreements.

76.     On or about August 18, 2017, Mr. Woodson and Mr. Kalnoki-kes formed ULLC for the purpose of competing with RAM on projects that they had been pursuing while employees of RAM.  At the time, both Mr. Woodson and Mr. Kalnoki-kes were both full time employees of RAM and subject to the Woodson Agreement and the Kalnoki-kes Agreement.

77.     During this same time period, during business hours and in RAM's place of business, Mr. Woodson and Mr. Kalnoki-kes solicited other employees of RAM and related companies to join their new venture as employees to engage in activities adverse to RAM and Evergreen's interests and in violation of their respective employment agreements.

78.     Mr. Kalnoki-kes has also retained in his possession and converted to his own use in furtherance of the tortious conspiracy set forth herein certain assets of RAM, including a laptop computer, paper files, electronic files and records.

## THE NELSON AGREEMENT

79.     On or about January 2017, RAM hired Mr. Nielson for the purpose of doing business development for RAM.  Mr. Nielson executed a certain agreement requiring that he keep certain items confidential, refrain from developing competing business interests while employed by RAM and refrain from competing directly with RAM after his employment ended.

80.     Mr. Nielson has materially breached these obligations by working in concert with the other Conspirators in developing a competing business interest while still employed by RAM, breaching his confidentiality obligations and by directly competing with RAM by contacting RAM's investors and customers in the hours and days following his termination.

81.     Mr. Nielson has also retained in his possession and converted to his own use in furtherance of the tortious conspiracy set forth herein certain assets of RAM, including a laptop computer, paper files, electronic files and records.

## THE WAITE AGREEMENT

82.     On or about April 2017, RAM hired Mr. Waite for the purpose of doing business development for RAM.  On June 13, 2017, Mr. Waite executed a certain agreement requiring that he keep certain items confidential, refrain from developing competing business interests while employed by RAM and refrain from competing directly with RAM after his employment ended.

83.     Mr. Waite has materially breached these obligations by working in concert with the other Conspirators in developing a competing business interest while still employed by RAM, breaching his confidentiality obligations and by directly competing with RAM by contacting RAM's investors and customers in the hours and days following his termination.

84.     Mr. Waite has also retained in his possession and converted to his own use in furtherance of the tortious conspiracy set forth herein certain assets of RAM, including a laptop computer, paper files, electronic files and records.

## CIVIL CONSPIRACY

85.     Upon information and belief, Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson, Mr. Waite, Mr. Cox, Mr. Gunderson, ULLC, Impel, Mr. Edwards and other Doe Defendants (the "Conspirators") combined to conspire to tortiously interfere with economic relations of Evergreen and Celtig, and to tortiously interfere with the economic relations of Evergreen and its investors, potential investors, clients and potential clients.

86.     The Conspirators set out to damage the economic relations between Evergreen and Celtig in order to appropriate the benefits of the Celtig Agreements for themselves, while many of

the Conspirators were actively drawing paychecks from the RAM. In doing this, the Conspirators breached their contractual obligations to Evergreen and RAM (as set forth above) as well as the associated duties of good faith and fair dealing that they owed to the Evergreen and RAM.

87.     Upon information and belief, in April 2017, Mr. Cox formed a series of companies that were intended to be the entities that would supplant Evergreen and RAM as one goal of the conspiracy.

88.     The Conspirators also worked in concert to wrongfully and groundlessly attempt to terminate the Celtig Agreements. Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson and Mr. Waite, while on the payroll or RAM, have created a business to supplant and appropriate the contracts between Evergreen and Celtig for themselves in contravention of their Employment Agreements and all common understandings of good faith and fair dealing.

89.     Most of the communications between Celtig and Evergreen or RAM were between one or more of these Conspirators.

90.     On or about September 7, 2017, Mr. Woodson used his control of relaycorp.com to disable the ability of the President of RAM and Evergreen to access his relaycorp.com email address.

91.     Subsequently, Mr. Edwards sent an email to the compromised relaycorp.com email address on September 11, 2017 which purports to terminate the Celtig Agreements. This notice fails to identify any breaches of the Celtig Agreements, and was not addressed to the proper email address per the notice provisions of the Celtig Agreements. Mr. Woodson would not have been able to tamper with the email address specified in the Celtig Agreements.

92.     As a result of Mr. Woodson's tampering with the email address, Evergreen and RAM received no notice of this purported termination on September 11, 2017. The Evergreen and RAM only became aware of this purported termination on September 14, 2017 when one of the RAM's investors forwarded a copy of it which they had received from Mr. Woodson.

93.     On the evening of September 12, 2017, Celtig was informed that Mr. Woodson would be terminated the following morning. Celtig was informed that the contents of that

communication were considered confidential pursuant to the Celtig Agreements, and the communication was marked conspicuously as "CONFIDENTIAL INFORMATION."

94.     In violation of the confidentiality provisions of the Celtig Agreement, Mr. Edwards almost immediately provided Mr. Woodson with the confidential information, along with the other conspirators.  Mr. Woodson responded by resigning on the morning of the 13th.  RAM replied by reminding him of his continuing duties of confidentiality and to not compete or attempt to usurp Evergreen and RAM's business relationships.  However, he immediately continued to do so and has been calling and meeting with existing and potential Evergreen investors and customers.

95.     On the evening of the 14th of September, Evergreen was notified that Mr. Edwards, Mr. Cox and Celtig had jointly retained an attorney in Salt Lake City who also happens to be the registered agent of nearly every entity formed or owned by Mr. Cox.

96.     Evergreen and RAM have been damaged as a result of the acts of the Conspirators in an amount to be proven at trial.

## FIRST COUNTERCLAIM
### (Breach of Contract – Celtig)

97.     These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

98.     Evergreen and Celtig entered into the Celtig Agreements as set forth herein.

99.     Evergreen has materially complied with the provisions contained therein.

100.    Celtig has breached the Celtig Agreements by, among other things, failing to comply with the requirements of Sections 1, 2, 4, 5, 6, 7, 10 and 13 of the Definitive Agreement as set forth herein, and by failing to comply with the requirements of Sections 1, 2, 3, 4 and 8 of the Licensing Agreement as set forth herein.

101.    The Counterclaimants have suffered damages as a result of Celtig's breaches.

102.    Counterclaimants are therefore entitled to judgment against Celtig as set forth in the prayer for relief below.

## SECOND COUNTERCLAIM
### (Breach of the Duty of Good Faith and Fair Dealing – Celtig)

103.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

104.    All contracts include an implied duty of good faith and fair dealing.

105.    Celtig has breached this duty of good faith and fair dealing in several ways as set forth herein by negotiating and entertaining discussion of incompatible business transactions in direct conflict with the existing Celtig Agreements and allowing others to act as their agents after naming Evergreen as their exclusive agent, by failing to inform the Counterclaimants of the civil conspiracy formed to circumvent the Celtig Agreements, by wrongfully attempting to terminate the Celtig Agreements and other instances to be presented at trial.

106.    Counterclaimants are therefore entitled to judgment against Celtig as set forth in the prayer for relief below.

## THIRD COUNTERCLAIM
### (Specific Performance – Celtig)

107.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

108.    The Celtig Agreements are of a type that specific performance is feasible.

109.    The terms of the Celtig Agreements are just and reasonable, with adequate consideration and provision for a healthy margin for Celtig under all circumstances.

110.    Evergreen and RAM have complied with all material obligations under the Celtig Agreements.

111.    Celtig has breached the Celtig Agreements as set forth above.

112.    Money damages are an inadequate remedy at law due to the scarcity of reliable producers of graphene.  Evergreen and RAM were not merely interested in reselling the graphene but have been developing applications for the graphene and anticipated that affiliated companies would be among the largest consumers of the graphene.

113.    These Counterclaimants are therefore entitled to a judgment and injunction against Celtig requiring specific performance of the Celtig Agreements.

## FOURTH COUNTERCLAIM
### (Declaratory Judgment – Celtig)

114.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

115.    A dispute has arisen between Celtig on the one hand and these Counterclaimants on the other regarding their respective rights and duties under the Celtig Agreements.

116.    Evergreen and RAM contend that Celtig has engages in numerous breaches of the Celtig Agreements, as set forth above, including a failure to produce and deliver the Section 1 Graphene, among other things.

117.    Evergreen and RAM contend that a plain reading of the Celtig Agreements do not give Celtig the right to terminate either agreement for the reasons set forth in the Second Amended Complaint.

118.    Under 28 USC § 2201 and Rule 57 of the Federal Rules of Civil Procedure, Evergreen and RAM are entitled to a declaratory judgment vindicating the contentions set forth in this counterclaim.

119.    The declaratory judgment Evergreen and RAM request is presently necessary to forbid Celtig from continuing its present misguided and unlawful course of action.

120.    Evergreen and RAM request a speed hearing of this counterclaim for a declaration regarding the contentions set forth in this counterclaim.


## FIRST 3rd PARTY CAUSE OF ACTION
### (Tortious Interference with Economic Relations – Mr. Woodson, Mr. Kalnoki-kes, Mr. Cox, Mr. Nielson, Mr. Waite, Mr. Gunderson, Mr. Edwards, Impel, ULLC)

121.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

122.    The Conspirators have each intentionally interfered with the Plaintiffs' existing and potential economic relations with a variety of parties, including Celtig and various potential and existing investors and clients.

123.    These Conspirators have each used improper means in doing so, including without limitation breached contractual duties and other duties owed to Evergreen and RAM in furthering their actions.

124.    These Third Party Defendants' breach has been part and parcel of the conspiracy complained of herein, which has precipitated the instant dispute between Celtig and Evergreen, and these Third Party Defendants would be liable for any damages Celtig may prove against Evergreen.

125.    The actions of these Conspirators have caused harm to the Plaintiffs in an amount to be determined at trial.

126.    Plaintiffs are therefore entitled to judgment against Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson, Mr. Waite, Mr. Cox, Mr. Gunderson, Impel, ULLC and Mr. Edwards as set forth in the prayer for relief below.

## SECOND 3rd PARTY CAUSE OF ACTION
### (Breach of Contract – Mr. Woodson, Mr. Nielson, Mr. Waite, Mr. Kalnoki-kes)

127.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

128.    RAM and these Third Party Defendants have entered into Employment Agreements as set forth herein.

129.    RAM has complied with all material terms of the Employment Agreements.

130.    These Third Party Defendants breached their Employment Agreements by seeking to supplant Evergreen and appropriate for themselves the business opportunity embodied in the Celtig Agreements, by disparaging their employer, by not honoring their confidentiality obligations, and in other instances that will be further developed in discovery.

131.     These Third Party Defendants' breach has been part and parcel of the conspiracy complained of herein, which has precipitated the instant dispute between Celtig and Evergreen, and these Third Party Defendants would be liable for any damages Celtig may prove against Evergreen.

132.     The Plaintiffs have been damaged in an amount to be determined at trial as a result of these breaches.

133.     Plaintiffs are therefore entitled to judgment against these Defendants as set forth in the prayer for relief below.

<u>**THIRD 3rd PARTY CAUSE OF ACTION**</u>
**(Breach of Duty of Good Faith and Fair Dealing – Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson, Mr. Waite)**

134.     These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

135.     All contracts include an implied duty of good faith and fair dealing.

136.     These Defendants breached this duty of good faith and fair dealing in several ways as set forth herein by negotiating and entertaining discussion of incompatible business transactions in direct conflict with their existing contractual obligations, by failing to inform the Plaintiffs of the civil conspiracy formed to circumvent the Celtig Agreements and other instances to be presented at trial.

137.     These Third Party Defendants' breach has been part and parcel of the conspiracy complained of herein, which has precipitated the instant dispute between Celtig and Evergreen, and these Third Party Defendants would be liable for any damages Celtig may prove against Evergreen.

138.     Plaintiffs are therefore entitled to judgment against these Defendants as set forth in the prayer for relief below.

## FOURTH 3rd PARTY CAUSE OF ACTION
### (Conversion – Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson, Mr. Waite)

139.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

140.    Since being terminated or leaving the employment of RAM and/or Evergreen, Mr. Woodson, Mr. Kalnoki-kes, Mr. Nielson and Mr. Waite have retained in their possession certain property belonging to RAM and/or Evergreen.  These items include various computers and other electronics, digital and paper documents and information, and control of the relaycorp.com domain and the associated email server data and website information.

141.    These Third Party Defendants have been using this converted property to further the conspiracy described herein, which has precipitated the instant dispute between Celtig and Evergreen, and these Third Party Defendants would be liable for any damages Celtig may prove against Evergreen.

142.    In the instance of Mr. Woodson, he also incurred approximately $47,000.00 on RAM credit and/or debit cards for personal expenses for which he didn't have authorization and for which he has failed to reimburse RAM.

143.    Due to these Third Party Defendants' continued exercise of dominion over these assets, inconsistent with the rights of the true owner of the same, these Third Party Defendants should be ordered to return such items, unmolested, and failing that, should be order such damages as will be proved at trial.

## FIFTH 3rd PARTY CAUSE OF ACTION
### (Breach of Contract – Impel)

144.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

145.    Evergreen and Impel entered into the Impel Agreement as set forth herein.

146.    Evergreen has performed all material obligations under the Impel Agreement.

147.    Impel has breached the Impel Agreement by disclosing confidential information and attempting to circumvent the Celtig Agreements.

148.    RAM and Evergreen are therefore entitled to judgment against Impel as set forth in the prayer for relief below.

## SIXTH 3rd PARTY CAUSE OF ACTION
### (Breach of Duty of Good Faith and Fair Dealing – Impel)

149.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

150.    All contracts include an implied duty of good faith and fair dealing.

151.    Impel has breached this duty of good faith and fair dealing in several ways as set forth herein by negotiating and entertaining discussion of incompatible business transactions in direct conflict with the existing Celtig Agreements, by failing to inform RAM of the civil conspiracy formed to circumvent the Celtig Agreements and other instances to be presented at trial.

152.    RAM and Evergreen are therefore entitled to judgment against Impel as set forth in the prayer for relief below.

## SEVENTH 3rd PARTY CAUSE OF ACTION
### (Civil Conspiracy – All 3rd Party Defendants)

153.    These Counterclaimants and Third-Party Plaintiffs incorporate by this reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

154.    The Third Party Defendants combined for the object of intentionally interfering with the Evergreen and RAM's existing and potential economic relations to the detriment of the Evergreen and RAM.

155.    There was a meeting of the minds of these Third Party Defendants on the object or the course of action that was the purpose of the conspiracy.

156.    These Third Party Defendants unlawfully and overtly breached contracts they had with Evergreen and RAM in furtherance of this civil conspiracy, as well as associated duties.

157.   Evergreen and RAM have been damaged in an amount to be determined at trial as a result of this conspiracy.

158.   Evergreen and RAM are therefore entitled to judgment against these Third Party Defendants as set forth in the prayer for relief below.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants and Third Party Plaintiffs pray for judgment against Counterdefendant and Third Party Defendants as follows:

1.   On the First Counterclaim, asserting a claim for breach of contract with respect to Celtig under the Celtig Agreements, for damages arising from the breach of contract in an amount determined at trial, along attorney's fees, costs, and pre- and post-judgment interest;

2.   On the Second Counterclaim, asserting a claim for breach of the implied covenant of good faith and fair dealing against Celtig, for compensatory damages resulting from Celtig's breaches, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

3.   On the Third Counterclaim, asserting a claim for specific performance, an order from the Court granting an injunction requiring Celtig to comply with the terms of the Celtig Agreements as written, along with attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

4.   On the Fourth Counterclaim, asserting a claim for a declaratory judgment setting forth the rights, duties and responsibilities of the Celtig and Evergreen, along with attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

5.   On the First 3rd Party Cause of Action, asserting a claim for tortious interference with economic relations against Mr. Woodson, Mr. Kalnoki-kis, Mr. Cox, Mr. Gunderson, Mr.

Nielson, Mr. Waite, Mr. Edwards, ULLC, and Impel, for damages resulting from such tortious interference, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

6.      On the Second 3rd Party Cause of Action, asserting a claim for breach of contract against Mr. Woodson, Mr. Kalnoki-kis, Mr. Nielson and Mr. Waite, for compensatory damages resulting from those Defendant's contractual breaches, in an amount to be determined at trial;

7.      On the Third 3rd Party Cause of Action, asserting a claim for breach of the implied covenant of good faith and fair dealing against Mr. Woodson, Mr. Kalnoki-kis, Mr. Nielson and Mr. Waite, for compensatory damages resulting from these Defendants' breaches, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

8.      On the Fourth 3rd Party Cause of Action, asserting a claim for conversion against Mr. Woodson, Mr. Kalnoki-kis, Mr. Nielson and Mr. Waite, for an injunction requiring the return of the converted property as well as for compensatory damages resulting from these Defendants' breaches, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

9.      On the Fifth 3rd Party Cause of Action, asserting a claim for breach of contract against Impel, for compensatory damages resulting from Impel's contractual breaches, in an amount to be determined at trial;

10.     On the Sixth 3rd Party Cause of Action, asserting a claim for breach of the implied covenant of good faith and fair dealing against Impel, for compensatory damages resulting from Impel's breaches, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial;

11.     On the Seventh 3rd Party Cause of Action, asserting a claim for civil conspiracy against all Third Party Defendants, for compensatory damages resulting from these Third Party Defendants' breaches, along with exemplary and punitive damages, attorneys' fees, costs, and pre- and post-judgment interest, in an amount to be determined at trial; and

9.     For such other and further relief as the Court deems just, equitable, or as allowed by law.

DATED the 1st day of November, 2017.

/s/ Michael J. Davidson
Michael J. Davidson
*Attorney for Counterclaimants and*
*Third Party Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2017, I caused a copy of this Answer, Counterclaim and Third Party Complaint to be sent via CM/ECF to counsel for Celtig.

/s/ Michael J. Davidson
Michael J. Davidson