IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CELTIG, LLC,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>AARON A. PATEY, *et al.*,<br><br>　　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS THIRD-PARTY DEFENDANT EDWARDS**<br><br>Case No. 2:17-cv-01086-JNP<br><br>District Judge Jill N. Parrish |

Before the court is Third-Party Defendant Brain Edwards's Motion to Dismiss with Prejudice Third-Party Complaint Against Third-Party Defendant Edwards for Lack of Personal Jurisdiction. For the reasons set forth below, the court GRANTS IN PART and DENIES IN PART Edwards's motion. The Third-Party Complaint filed by Third-Party Plaintiffs Evergreen Strategies, LLC and Relay Advanced Materials, Inc. is dismissed without prejudice as to Edwards.

## I.　　INTRODUCTION

Third-Party Plaintiffs Evergreen and Relay Advanced Materials (RAM) bring suit against Third-Party Defendant Brian Edwards, CEO of Celtig, LLC, on two counts: tortious interference with economic relations and civil conspiracy. Third-Party Complaint ¶¶ 121-26; 153-58. Edwards moves to dismiss the claims against him for lack of personal jurisdiction. Motion to Dismiss ("Motion").

Evergreen and RAM allege personal jurisdiction over Edwards arising from his actions "in furtherance of the common scheme to commit tortious and contractual breaches" that caused "tortious injury" to Third-Party Plaintiffs in the state of Utah, "pursuant to Utah Code § 78B-3-205(3)." Third-Party Compl. ¶ 13, 22. Evergreen and RAM have not alleged that Edwards is

domiciled in the state of Utah, which would subject Edwards to the court's general jurisdiction. Therefore, to establish personal jurisdiction over Edwards individually, Evergreen and RAM must meet their burden of showing that Edwards intentionally caused Third-Party Plaintiffs harm within the state of Utah. As Evergreen and RAM have failed to allege a prima facie case of conspiracy involving Edwards, the court must dismiss, without prejudice, the claims against Edwards for lack of personal jurisdiction.

## II. FACTUAL ALLEGATIONS

### A. BACKGROUND

This case involves a business dispute between the parties regarding the substance graphene, a "unique substance that has not been easily or economically produced." Third-Party Compl. ¶ 1. Plaintiff and Third-Party Defendant Celtig L.L.C. is a Tennessee limited liability company that created a process allowing for the mass production of graphene at low cost. Third-Party Compl. ¶ 1, 8. On or about March 28, 2017, Evergreen, a Nevada limited liability company with offices in Utah County, Utah, signed two business agreements with Celtig: the Definitive Agreement and the *Exclusive License and Distribution Agreement* ("Licensing Agreement"). Third-Party Compl. ¶¶ 6, 25. On or about the same day, Evergreen and Impel Sales LLC, a Utah limited liability company (Third-Party Compl. ¶ 16), entered into the "Impel Agreement." Third-Party Compl. ¶ 65. Finally, as part of the negotiations, Third-Party Plaintiff Relay Advanced Materials, Inc. ("RAM"), a Delaware corporation whose principal place of business is Lindon, Utah, was formed "for the purpose of purchasing product from Celtig." Third-Party Compl. ¶ 7.

Conflict between the parties concerning the Definitive Agreement arose almost immediately after the signing. Section 1 of the Definitive Agreement calls for Evergreen to pre-pay $750,015 for the purchase of 833,350 grams of graphene from Celtig within three business

2

days following execution of the agreement. Third-Party Compl. ¶ 27. Evergreen and RAM allege that Evergreen pre-paid the $750,015, but Celtig failed to deliver the 833,350 grams of graphene. Third-Party Compl. 29. Evergreen alleges that Celtig refused to deliver the graphene because it was unable to produce graphene that met the quality and purity standards to which the parties agreed. Third-Party Compl. ¶ 30. Evergreen and RAM also allege that Celtig refused to deliver the graphene because of concerted actions taken by the "Conspirators." The Conspirators allegedly mischaracterized the requirements of the Definitive Agreement to make it appear that the $750,015 payment was for graphene that Celtig would produce at a later date and that the graphene would need to be paid for again before delivery. Third-Party Compl. ¶ 32. These mischaracterizations made it appear to Celtig that Evergreen breached the Definitive Agreement. Third-Party Compl. ¶ 32.

### B. THE CONSPIRACY

The "Conspirators" allegedly include Brent Benjamin Woodson, Phillip Cox, Michael Gunderson, Tibor Kalnoki-kes, David Nielson, David Waite, Brian Edwards, ULLC, Impel Sales, and "other Doe Defendants." Third-Party Compl. ¶ 85.  According to Evergreen, the Conspirators "precipitated the instant dispute between Evergreen and Celtig," and are "liable for any damages Celtig may prove against Evergreen." Third-Party Compl. ¶ 124.   The Conspirators allegedly made it appear that Evergreen breached the Definitive Agreement, but in actuality, it was Celtig that breached the Definitive Agreement on multiple occasions. Third-Party Compl. ¶ 34-45. Celtig also allegedly breached the requirements of the Licensing Agreement. Third-Party Compl. ¶ 58. According to Evergreen and RAM, "some or all of these breaches by Celtig are the result of the concerted action of some or all of the Conspirators." Third-Party Compl. ¶ 46.

The Conspirators allegedly also attempted to directly interfere with the business agreements between Celtig, Evergreen, and RAM by establishing competing businesses. In April

2017, Cox allegedly formed "a series of companies" to "supplant Evergreen and RAM." Third-Party Compl. ¶ 87. On or about August 18, 2017, Woodson and Kalnoki-kes allegedly formed ULLC for the purpose of competing with RAM, in violation of their employment agreements. Third-Party Compl. ¶ 70. Nielson and Waite allegedly worked in concert with Woodson and Kalnoki-kes to establish ULLC. Third-Party Compl. ¶ 80, 82. It is not alleged that Edwards had any involvement with this part of the scheme.

After six months of failed business negotiations, on or about September 11, 2017, Edwards, acting on behalf of Celtig, attempted to terminate the Definitive Agreement and the Licensing Agreement by sending an email to the President of RAM and Evergreen. Third-Party Compl. ¶ 91. According to Evergreen, Celtig's attempts to terminate the Definitive Agreement and Licensing Agreement were without cause. Third-Party Compl. ¶¶ 53, 62. Evergreen and RAM allege that "[b]ut for the tortious activities of the Conspirators, no attempt would have been made by Celtig to terminate the Definitive Agreement" or the "Licensing Agreement," two actions which "furthered the aims of the Conspirators." Third-Party Compl. ¶¶ 54, 62, 63.

RAM and Evergreen did not receive the email terminating the agreements until three days later, on September 14, 2017, allegedly because Edwards did not address the email to the correct email address per the notice provisions of the agreements. Instead, Edwards sent the email to the President's "relaycorp.com" email, which allegedly had been tampered with by Woodson. Third-Party Compl. ¶ 92. It is alleged that Woodson, one of the Conspirators, on or about September 7, 2017, used his control of RAM's email server, "relaycorp.com" to prevent the President of RAM and Evergreen from accessing his email address. Third-Party Compl. ¶ 90. The correct email address could not have been tampered with by Woodson. Third-Party Compl. ¶ 91.

During the same time period, on or about September 12, 2017, someone at RAM informed Celtig that Woodson was going to be fired in a communication marked "CONFIDENTIAL INFORMATION." Third-Party Compl. ¶ 93. Edwards was allegedly bound, as CEO of Celtig, by the Definitive Agreement and the Licensing Agreement, which contained confidentiality provisions prohibiting "disclosing confidential information to third parties without the consent of Evergreen." Third-Party Compl. ¶ 47. Edwards had been informed the communicated information was confidential per the terms of the agreements between Celtig and Evergreen. Third-Party Compl. ¶ 94. Despite this, Edwards told Woodson that he was going to be fired. Woodson quit the next day, on or about September 13, 2017. Third-Party Compl. ¶ 94.

### C. THE LAWSUIT

On September 14, 2017, Evergreen learned that Edwards, Cox, and Celtig had jointly retained an attorney in Salt Lake City, Utah. Third-Party Compl. ¶ 96. On September 26, 2017, Celtig filed suit against RAM and Evergreen, alleging, among other things, breach of contract and fraud. Motion 3. Evergreen and RAM filed their Third-Party Complaint on November 1, 2017. Evergreen and RAM allege that the Conspirators tortiously and intentionally interfered with Evergreen's contractual relationship with Celtig in order to appropriate the benefits of the contracts for themselves, as well as conspiring to damage Evergreen and RAM's "relationships with potential partners." Third-Party Compl. ¶ 86; 4. As a result of their actions, and the breaches by Celtig, Evergreen and RAM allege they have been harmed in an amount "which conservatively exceeds $5 billion dollars [sic]." Third-Party Compl. ¶ 5.

### III. ANALYSIS

### A. PERSONAL JURISDICTION GENERALLY

Edwards moves to dismiss with prejudice Evergreen and RAM's Third-Party Complaint against Edwards for lack of personal jurisdiction. A court may dismiss a party for lack of personal

jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. Such a dismissal is without prejudice. *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 (10th Cir. 2002).[1]

When personal jurisdiction is contested at the pleading stage, courts may determine whether it exists based on the pleadings and affidavits. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). The plaintiff bears the burden of establishing personal jurisdiction. *Id.* A plaintiff makes this prima facie showing "by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007) (citation omitted). The court must accept as true well-pleaded allegations in the plaintiff's complaint so long as they are not contradicted by an affidavit. *Id.* In this case, neither party has submitted affidavits or other evidence in connection with the motion to dismiss, thus all facts are drawn from the third-party complaint and responsive pleadings, and all well-pled allegations in the complaint are accepted as true. *See Shrader*, 633 F.3d at 1242 (limiting "facts that must be accepted for purposes of the jurisdictional analysis to those well pled (that is, plausible, non-conclusory, and non-speculative)" (internal quotation marks and citation omitted)).

A federal court sitting in diversity may only assert personal jurisdiction over a defendant if the defendant is subject to the jurisdiction of a court of general jurisdiction in the state in which the district court is located and the exercise of personal jurisdiction comports with the due process clause of the Fourteenth Amendment. *Melea*, 511 F.3d at 1065. Under the first prong, the court looks to Utah law for the limits of its jurisdiction. *See* Fed. R. Civ. P. 4(k)(1)(A). Both parties

---

[1] Personal jurisdiction "is an essential element" of this court's jurisdiction, "without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citing to *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937). Therefore, dismissal with prejudice would be contrary to the established rule that dismissals for lack of personal jurisdiction are without prejudice. *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1216 (10th Cir. 2002).

allege that Edwards "resides" in Tennessee. Third-Party Compl. ¶ 13; Motion 3. As Edwards is an out-of-state defendant, the court must look to Utah's long-arm statute. Utah's long-arm statute extends jurisdiction "to the fullest extent permitted by the due process clause of the Fourteenth Amendment." Utah Code Ann. § 78B-3-201(3). Accordingly, the personal jurisdiction analysis in this case involves only the second-prong inquiry: whether the exercise of jurisdiction over Edwards comports with the due process clause of the Fourteenth Amendment. *See Melea*, 511 F.3d at 1065.

### B. DUE PROCESS

Under the due process clause, a court may exercise personal jurisdiction over a defendant so long as (1) the defendant "purposefully established minimum contacts with the forum State" and (2) the assertion of personal jurisdiction comports with notions of "fair play and substantial justice." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

### 1. Minimum Contacts

A defendant's contacts, depending on their quality and quantity, may give rise to either general or specific jurisdiction. *Id.* The court only has general jurisdiction over an individual domiciled in the state. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile. . . ." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Here, Evergreen and RAM allege that Edwards is a resident of Tennessee. Third-Party Compl. ¶ 13; Motion, 3. They do not allege that he is domiciled in Utah. They have not argued that the court has general jurisdiction over Edwards. As such, Evergreen and RAM have not established that the court has general jurisdiction over Edwards.

In the absence of general jurisdiction, the court turns to an analysis of specific jurisdiction, the first element of which is the minimum contacts analysis. A court may find the necessary minimum contacts if: (1) the defendant "purposefully directed its activities at residents of the

7

forum state," and (2) the plaintiff's injuries "arise out of the defendant's forum-related activities." *Old Republic*, 877 F.3d at 904 (quoting *Shrader*, 633 F.3d at 1239).

### a. *Purposeful Direction/Availment*[2]

The first consideration in the minimum contacts analysis is whether Edwards purposefully directed activities at residents of the forum state, in this case Utah. This "requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citations omitted). An out-of-state defendant purposefully directs activities at the forum either by "purposefully avail[ing] itself of the privilege of conducting activities within the state" or when defendant's "*intentional* conduct targets and has substantial harmful effects in the forum state." *Old Republic*, 877 F.3d at 918 (quoting *Burger King*, 471 U.S. at 475) and *id.* at 907 (quoting *Calder v. Jones*, 465 U.S. 783, 790–91 (1984)).

Evergreen and RAM have not named Edwards as a defendant because he did business in the state of Utah. Opposition to Motion to Dismiss ("Opposition") 2. Edwards did not do business in Utah in his personal capacity and his role as CEO of a company doing business in the state of Utah is insufficient to subject him to personal jurisdiction in Utah. *Wegerer v. First Commodity Corp. of Boston*, 744 F.2d 719, 726–27 (10th Cir. 1984). In their opposition to the motion to dismiss, Third-Party Plaintiffs cite to *Armed Forces Ins. Exch. V. Harrision*, 2003 UT 14, ¶ 19, 70 P.3d 35, 41, arguing that Edwards's role as an agent for Celtig is "irrelevant," because any tortious

---

[2] "The purposeful direction and 'arising out of' requirements together comprise the minimum contacts analysis." *Old Republic*, 877 F.3d at 909 n.19. The Tenth Circuit "usually use[s] the term 'purposeful direction' in the tort context and 'purposeful availment' in the contract context." *Id.* at 904 n.11. "In any event, the terms 'purposeful direction' and 'purposeful availment' denote the same requirement." *Id.*

conduct Edwards committed, even acting as CEO, can subject him to personal liability. Opposition 3. However, *Harrison*, is not directly applicable here. First, *Harrison* was a fraud case. Secondly, although *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1102 (10th Cir. 2009) expanded *Harrison* to more than just fraud cases, neither case supports the exercise of personal jurisdiction over an agent of a company solely because the company is alleged to have committed wrongful acts. *See Proficio Bank v. Wire Source*, *LLC*, No. 2:11-CV-808, 2012 WL 1448207, at *3 (D. Utah 2012) (citing *Rusakiewicz v. Lowe*, 556 F.3d at 1102). Rather, jurisdiction over Edwards must be established based on his individual contacts, lawful or unlawful, with the forum state.

Evergreen and RAM allege personal jurisdiction over Edwards because "he has participated in tortious activity which had caused damages to the Third-Party Plaintiffs within the State of Utah." Opposition 2; Third-Party Compl. ¶ 22. To establish personal jurisdiction based on "effects" felt within the state, Tenth Circuit law requires three elements: "(a) an intentional action . . . , that was (b) expressly aimed at the forum state . . . , with (c) knowledge that the brunt of the injury would be felt in the forum state." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 907–08 (10th Cir. 2017) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008); *see also Newsome v. Gallacher*, 722 F.3d 1257, 1268 (10th Cir. 2013) (applying the same three-factor test).

The first question in this case is what "tortious activity" forms the basis for the assertion of personal jurisdiction. The court cannot evaluate whether Edwards directed tortious activity at the state of Utah without a clear idea of what tort he allegedly committed. Evergreen and RAM name Edwards as a third-party defendant in two counts: tortious interference with economic relations and civil conspiracy. Third-Party Compl. ¶¶ 121–126, ¶ 153–158. What is not entirely clear is whether Edwards is being sued individually for tortious interference with economic

relations, or whether tortious interference with economic relations is simply the tort underlying the alleged civil conspiracy. Motion 4 n.1. Although Third-Party Plaintiffs' initial assertion of personal jurisdiction broadly refers to participation in "tortious activity," they later assert that Edwards only acted "in his individual capacity in furtherance of the common scheme to commit tortious and contractual breaches." Third-Party Compl. ¶ 13. This is repeated in their opposition to the motion to dismiss, where they claim Edwards was only named "as a participant in a conspiracy to commit intentional torts." Opposition 2. Accordingly, the personal jurisdiction analysis will focus on whether the court can exercise personal jurisdiction over Edwards based on his alleged participation in a civil conspiracy.

### i. Civil Conspiracy

In *Melea, Ltd. v. Jawer, SA*, 511 F.3d 1060, 1070 (10th Cir. 2007), the Tenth Circuit held a conspiracy directed at the forum can form the basis for personal jurisdiction if at least some act in furtherance of the conspiracy happens in the forum. In *Newsome v. Gallacher*, 722 F.3d 1257, 1265–66 (10th Cir. 2013), the Tenth Circuit extended *Melea* to allow the assertion of personal jurisdiction over co-conspirators whose actions merely targeted the forum. However, to meet their burden of establishing personal jurisdiction, plaintiffs "must offer more than 'bare allegations' that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy." *Melea,* 511 F.3d at 1069 (quoting *Lolavar v. de Santibanes,* 430 F.3d 221, 229-30 (4th Cir. 2005)).

In addition to making "a threshold showing that a conspiracy existed," plaintiffs must demonstrate "that the defendants participated therein." *Lolavar v. de Santibanes*, 430 F.3d at 229 (citing *McLaughlin v. McPhail*, 707 F.2d 800, 807 (4th Cir. 1983)). In *Newsome*, 722 F.3d at 1266, the court accepted the plaintiff's contention that personal jurisdiction could be analyzed identically for all co-conspirators. In that case, the defendants were all board members of the same

company, domiciled in Canada, and were all alleged to have participated in the conspiracy in identical ways. Thus, for personal jurisdiction purposes, they were identical. But that is not the case here.

In this case, the "Conspirators" have different domiciles, worked for three separate companies, and had varying involvement in the alleged conspiracy. Edwards was CEO of Celtig. Third-Party Compl. ¶ 13. Woodson, Kalnoki-Kes, Nielson, and Waite were all employees of RAM. Third-Party Compl. ¶ 9-15. Cox and Gunderson both worked for Impel. Third-Party Compl. ¶¶ 10, 11. Utah Lake Legacy Coalition LLC (ULLC) is not defined in the Third Party Complaint. Accordingly, in order to establish personal jurisdiction under a conspiracy theory, Evergreen and RAM must establish that Edwards himself actively participated in the conspiracy to harm Third-Party Plaintiffs in Utah.

Under Utah law, a civil conspiracy requires proof of five elements: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944, 954-55 (internal citation omitted). In this case, Evergreen and RAM allege that (1) "The Third Party Defendants"; (2) "combined  for the object of intentionally interfering with the [sic] Evergreen and RAM's existing and potential economic relations"; (3) that "there was a meeting of the minds of these Third Party Defendants on the object or the course of action,"; (4) the "Third Party Defendants unlawfully and overtly breached contracts . . . in furtherance of this civil conspiracy" and (5) "Evergreen and RAM have been damaged in an amount to be determined at trial as a result of this conspiracy." Third-Party Compl. ¶¶ 153-58. These base allegations are insufficient to establish civil conspiracy.

Evergreen and RAM allege that Edwards combined with the other Third-Party Defendants for the object of tortiously and intentionally interfering with Evergreen's economic relations with Celtig in order to appropriate the benefits of the contracts for themselves, as well as interfering with Evergreen and RAM's potential investors. Third-Party Compl. ¶¶ 4, 86. As evidence of this, Evergreen and RAM allege that Cox, Woodson, and Kalnoki-kes formed "a series of companies," including ULLC, to "supplant Evergreen and RAM." Third-Party Compl. ¶¶ 70, 87. Nielson and Waite allegedly aided Woodson and Kalnoki-kes to establish ULLC. Third-Party Compl. ¶¶ 80, 82. The existence of the competing companies is some evidence that the Conspirators intended to interfere with the business relationships of the companies; however, it is not alleged that Edwards had any involvement with this part of the scheme.

Although Evergreen and RAM identify Edwards as one of a combination of two or more persons who pursued a wrongful object, they fail to establish a meeting of the minds between Edwards and the other alleged conspirators. To establish a meeting of the minds, Evergreen and RAM allege that Edwards communicated with the other conspirators. Third-Party Compl. ¶ 33. In *Melea*, 511 F.3d at 1070, the court refused to assert personal jurisdiction over a defendant whose only forum-related action with regard to the purported conspiracy was receiving communications from Colorado. In this case, Edwards sent and received correspondence to and from Utah, but there is no direct evidence that this correspondence was part of a conspiracy. Edwards was CEO of Celtig. He signed documents and correspondence on behalf of Celtig. He is the only named Third-Party Defendant who worked for Celtig. But that does not make him "necessarily involved" in a conspiracy. Opposition 4.

Besides general allegations that Edwards communicated with Conspirators, Evergreen and RAM assert only two actions by Edwards in furtherance of a conspiracy. First, they assert that

Edwards deliberately sent the wrongful termination notices regarding the Definitive and Licensing Agreements to an email account that Woodson had compromised. Third-Party Compl. ¶ 91. Second, they assert that Edwards breached the confidentiality provisions of the agreement by informing Woodson that he would be fired. Third-Party Compl. ¶ 94. Edwards denies that Celtig's termination of the agreements was wrongful and he further denies that directing an email to an incorrect address constitutes any proof of a conspiracy. Motion 9-10; *see also* Reply to Opposition to Motion to Dismiss ("Reply") ¶ 16. The court agrees that these events appear to be mere parallel action and therefore not evidence of an actual agreement. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

Even were there proof of a meeting of the minds, to satisfy the fourth element of a civil conspiracy, case law requires that a plaintiff show that the defendant participated in an underlying tort. *Estrada v. Mendoza*, 2012 UT App 82, 275 P.3d 1024, 1029. "Where plaintiffs have 'not adequately pleaded any of the basic torts they allege ... dismissal of their civil conspiracy claim' is appropriate." *Id.* (citation omitted). Thus, Evergreen and RAM must establish that Edwards participated in an underlying tort in order state a claim for civil conspiracy.

### ii. *Tortious Interference with Economic Relations*

The underlying tort on which Evergreen and RAM base their civil conspiracy claim is tortious interference with economic relations. Under Utah law, tortious interference with economic relations is an umbrella term encompassing two torts: intentional interference with performance of a contract (Restatement (Second) of Torts § 766A) and intentional interference with prospective contractual relations (Restatement (Second) of Torts § 766B). *See Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982), *overruled on other grounds by Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553 ("the right of action for interference with a specific contract is but one instance, rather than the total class, of protections against wrongful interference with advantageous

economic relations"). Many of the elements of the two claims overlap, and courts often analyze the two claims together under the umbrella of tortious interference with economic relations. *See Anderson Dev. Co. v. Tobias*, 2005 UT 36, 116 P.3d 323; *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991).

The prospective economic relations variant of the tort was first recognized by the Utah Supreme Court in *Leigh Furniture*, 657 P.2d 293 (Utah 1982). As originally adopted, a plaintiff seeking to recover damages was required to prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) *for an improper purpose* or by improper means, (3) causing injury to the plaintiff." *Id.* at 304 (emphasis added). In *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553, the Utah Supreme Court abandoned the alternative formulation of the second element that had allowed a plaintiff to establish a claim of intentional interference based upon a defendant's "improper purpose." Among its articulated reasons for abandoning the improper purpose alternative were the "problems inherent in proving motivation or purpose" and the difficulty of providing meaningful guidance on the issue for both courts and parties alike. *Id.* at 555; 561-63. Thus, to prove a claim for intentional interference, a plaintiff must now establish that the interference was accomplished by improper means. Unfortunately, in abandoning the improper purpose alternative in the tortious interference test, the court did not specify whether the revised formulation applies to claims for tortious interference with existing contract, tortious interference with prospective economic relations, or both, although the language from *Leigh Furniture* cited by the court had laid out the standard for establishing the newly formulated tort of interference with prospective contractual relations. *See Leigh Furniture*, 657 P.2d at 304.

The scope of the *Eldridge* opinion is of importance here because it bears on the issue of whether Edwards, acting in his capacity as CEO of Celtig, utilized improper means in terminating Celtig's contract with Evergreen or in breaching the confidentiality provisions of those contracts. Prior to *Eldridge,* there was a key difference between the torts of interference with existing contract and interference with prospective economic relations. In *Leigh Furniture*, the court held that a "deliberate breach of contract, even where employed to secure economic advantage, is not, by itself, an 'improper means.'" *Leigh Furniture*, 657 P.2d at 309. "It is settled that one party to a contract cannot be liable for the tort of interference with contract for inducing a breach by himself or the other contracting party." *Id.* at 301. Thus, to sue for interference with an existing contract, a plaintiff must establish that the defendant "intentionally and improperly interfere[d] with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract." *Id.* (quoting Restatement (Second) of Torts §766).

In recognizing the theory of efficient breach or the right of a contracting party to breach its own contract, the court in *Leigh Furniture* acknowledged that a breach of contract action could entirely compensate the other party through payment of contract damages, giving defendants an efficient breach defense in an intentional interference with existing contract tort action. *Id.* at 301. *Leigh Furniture* extended the defense to claims for intentional interference with prospective economic relations as well; however, the court limited the defense by holding that a deliberate breach of contract "committed for the immediate purpose of injurying [sic] the other contracting party" can satisfy the "improper means" prong of a claim for tortious interference with prospective economic relations. *Id.* at 309, 311. In other words, if a plaintiff could prove deliberate breach *and* an improper purpose, then efficient breach was not a defense in the intentional interference with prospective economic relations context. In fact, in *Leigh Furniture*, the court declined to

sustain the jury verdict for intentional interference with an existing contract because the defendant was a party to the contract at issue, but it affirmed the jury verdict for intentional interference with prospective contractual relations. *Id.* at 301-02, 311

Given the Utah Supreme Court's more recent rejection of the improper purpose alternative in *Eldrige v. Johndrow*, and its recognition of the inherent problems in proving improper purpose, it is questionable whether the distinction recognized in *Leigh Furniture* survived. *Eldridge v. Johndrow,* 2015 UT 21, ¶ 45, 345 P.3d 553, 561. It now appears that, under Utah law, a plaintiff can no longer establish the improper means element of a claim for intentional interference based solely on the defendant's motivation for breaching its own contract. Indeed, it would be inconsistent with the reasoning of *Eldridge* to consider a party's motivation for breaching its contract in determining whether the party could satisfy the improper means element of a claim for either tortious interference with existing or prospective economic relations. In other words, the efficient breach defense is available to defendants in any tortious interference with economic relations action. This is the same conclusion reached in *Vasquez v. Trinity Mission Health*, No. 2:11-CV-01002-EJF, 2013 WL 4095157, at *21 (D. Utah 2013) (holding that "[defendant] cannot tortiously interfere with its own business").

Evergreen and RAM allege tortious interference with economic relations generally.[3] They do not differentiate between existing contract and prospective economic relations. This approach is consistent with *Eldridge* and other Utah Supreme Court cases that have included tortious interference with prospective economic advantage in their analysis of tortious interference with

---

[3] Evergreen and RAM allege that (1) the "Conspirators have each intentionally interfered with the Plaintiff's existing and potential economic relations with a variety of parties, including Celtig"; (2) the "Conspirators have each used improper means in doing so, including without limitation breached contractual duties and other duties owed to Evergreen and RAM"; and (3) "the actions of these Conspirators have caused harm to the Plaintiffs." Third Party Compl. ¶ 121–126.

economic relations. *See Anderson Dev. Co. v. Tobias*, 2005 UT 36, 116 P.3d 323 and *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991). Because the former, pivotal difference regarding the efficient breach defense appears to have been eliminated by *Eldridge*, the court will analyze the claims together as well.

To support their claim for tortious interference, Evergreen and RAM allege that Edwards, acting on behalf of Celtig, attempted to unilaterally terminate the agreements between Celtig and Evergreen. Third-Party Compl. ¶ 91. They allege that he did so by sending an email to an email address that had been compromised by Woodson. Third-Party Compl. ¶ 91. They allege that Celtig's attempts (through Edwards) to unilaterally terminate the Definitive Agreement and Licensing Agreement were breaches of contract undertaken in an attempt to deprive Evergreen of economic advantages. Third-Party Compl. ¶¶ 53-54. However, because Edwards acted as the agent of Celtig in communicating with Evergreen and RAM, and Celtig was party to the terminated agreements, Edwards cannot be held liable for tortious interference, because he was entitled to terminate the agreements on Celtig's behalf under an efficient breach theory.

Evergreen and RAM also allege that Edwards acted "in furtherance of this conspiracy" by providing Woodson with confidential information in breach of confidentiality provisions in the Definitive and Licensing Agreements. Third-Party Compl. ¶ 94; Opposition 4. Edwards signed those agreements on behalf of Celtig, and was bound by them in his official capacity. Third-Party Compl. ¶ 13. Again, however, Celtig's alleged breach of these agreements does not give rise to a claim of tortious interference.

To hold Edwards personally liable for tortious interference, Evergreen and RAM would need to establish that Edwards, acting in his personal capacity, and not on behalf of Celtig, interfered with the economic relations between Celtig, RAM, and Evergreen. As stated, Edwards

cannot be held liable for interfering with the agreements in his role of CEO because he represented Celtig, which was a party to the agreements. At most, Evergreen and RAM may be able to argue that Edwards interfered with the employment contract between Woodson and RAM when he warned Woodson, enabling Woodson to quit before he could be fired by RAM. But Edwards's alleged actions did not cause any harm that RAM did not already intend to bring about. And in any event, the alleged actions do not rise to the level of "improper means" necessary to establish tortious interference. Under Utah law, to qualify as improper means, an action must be "contrary to law, such as violations of statutes, regulations, or recognized common-law rules," including "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1084 (10th Cir. 2018) (internal quotation marks omitted) (citing *Leigh Furniture*, 657 P.2d at 308). As stated by the Tenth Circuit, "A competitor's attempt merely to convince third parties not to deal with a plaintiff does not meet this requirement." *SCO Grp.,* 879 F.3d at 1084. Edwards may have breached a confidentiality agreement, but his communication to Woodson would constitute only a breach of contract, and such a breach does not qualify as improper means under Utah law.

In summary, the allegations against Edwards all fail to support claims against him for tortious interference with existing or prospective economic relations. Because Evergreen and RAM have failed to establish the underlying tort of intentional interference with economic relations, they have failed to establish a prima facie case of civil conspiracy involving Edwards.

### b. *Arising From*

The second step in the minimum contacts analysis is to determine whether the claims brought by Third-Party Plaintiffs "arise out of" Edwards's "suit-related" contacts with the forum. *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1280 (10th Cir. 2016). The claims brought against

Edwards in the third-party complaint do arise from his alleged contacts with Utah, which relate exclusively to the present dispute. As discussed above, however, the contacts as alleged are insufficient to establish minimum contacts with the forum.

### c. Insufficient Contacts

Due process requires that a defendant have minimum contacts with the forum state before the court may exercise personal jurisdiction over him. Evergreen and RAM have failed to allege minimum contacts between the state of Utah and Edwards acting in his personal capacity, and thus have failed to meet their burden of establishing personal jurisdiction over him.

The minimum contacts analysis examines whether a defendant purposefully directed activity at the forum and whether the claims against him arise from his contacts with the state. When personal jurisdiction, as here, is based on a civil conspiracy directed at the forum state, plaintiffs must allege a prima facie case of civil conspiracy involving the defendant. Evergreen and RAM have failed to allege a prima facie case of civil conspiracy. They have failed to allege sufficient facts to establish a meeting of the minds between Edwards and other parties. They have failed to establish that Edwards participated in the underlying tort of tortious interference with economic relations. Accordingly, the court cannot exercise personal jurisdiction over Edwards.

### 2. Traditional Notions of Fair Play and Substantial Justice (Reasonableness)

To satisfy due process, a party seeking to establish personal jurisdiction over a defendant must not only establish that the defendant had minimum contacts with the forum, it must also establish that the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987). Third-Party Plaintiffs also fail to satisfy this independent requirement. The court concludes that it cannot exercise personal jurisdiction over Edwards because doing so would violate notions of fair play and substantial justice.

Whether jurisdiction is reasonable in accordance with traditional notions of fair play and substantial justice depends on five factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

*Pro Execc, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1279–80 (10th Cir. 2005) (citation omitted).

Here, the exercise of personal jurisdiction would be unreasonable. Edwards "resides" in Tennessee, and the burden on Edwards to travel to Utah would be high. Furthermore, both Utah and Third-Party plaintiffs' interests in resolving the dispute efficiently can be satisfied without Edwards. Any contact he has had with Utah has been in his role as CEO of Celtig and Celtig is a party to the suit. Thus, naming Edwards as a defendant in his personal capacity is unnecessary. Under these circumstances, the court accordingly concludes that it would be unreasonable to exercise personal jurisdiction over Edwards. Evergreen and RAM may choose to pursue further claims against Edwards, but those actions must be brought in a forum in which he is subject to personal jurisdiction.

## IV.    ORDER

The court GRANTS IN PART and DENIES IN PART Brain Edwards's Motion to Dismiss with Prejudice Third-Party Complaint Against Third-Party Defendant Edwards for Lack of Personal Jurisdiction (ECF No. 29). It is hereby ORDERED that the Third-Party Complaint filed by Third-Party Plaintiffs Evergreen Strategies, LLC and Relay Advanced Materials, Inc. (ECF No. 24) is DISMISSED WITHOUT PREJUDICE as to Edwards.

Signed September 26, 2018

BY THE COURT

Jill N. Parrish
United States District Court Judge