IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CELTIG, LLC, a Tennessee limited liability company;<br><br>Plaintiff,<br>v.<br><br>AARON A. PATEY, an individual; EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; PSD INTERNATIONAL, LLC, a Utah limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-01086<br><br>District Judge Jill N. Parrish |
| EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Counterclaimants,<br>v.<br><br>CELTIG, LLC, a Tennessee limited liability company;<br><br>Counterclaim-Defendants, | |
| EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Third-Party Plaintiffs,<br>v.<br><br>BRENT BENJAMIN WOODSON; PHILLIP COX; MICHAEL GUNDERSON; DAVID NIELSON; IMPEL SALES, LLC, a Utah Limited Liability Company; and UTAH LAKE LEGACY COALITION LLC, a Utah limited liability company;<br><br>Counterclaim-Defendants | |

1

This matter is before the court on the partial Motion for Summary Judgment (the "Motion") filed by Defendants Evergreen Strategies, LLC ("Evergreen"), Relay Advanced Materials, Inc. ("RAM"), PSD International, LLC ("PSDI"), and Aaron A. Patey ("Patey") (collectively "Defendants"). Defendants urge the court to enter summary judgment in their favor on Plaintiff Celtig LLC's ("Celtig") third cause of action, which seeks a declaratory judgment that Plaintiff properly terminated the contractual agreements at issue in this case, and Defendants' Third Counterclaim, which seeks specific performance requiring Celtig to comply with the termination provisions in the contractual agreements. Because of Defendants' conduct during discovery, including failing to appear for properly noticed depositions in November 2018 and January 2019, the court imposed sanctions on the Defendants and entered an order striking all the Defendants' counterclaims against Celtig. *See* ECF No. 192 at 3. Therefore, the court addresses only the Defendants' Motion for Summary Judgment concerning Plaintiff's third cause of action for a declaratory judgment.

## I. FACTUAL BACKGROUND

This case arises from a business dispute over the alleged breach of contractual agreements to buy and sell graphene, a substance used in various industrial applications. Celtig, a Tennessee limited liability company,[1] created a process allowing for the mass production of graphene at low cost. Aaron Patey is a citizen of Utah. Patey owned and operated the following entities: Evergreen, a Nevada limited liability company whose members are citizens of Utah; PSDI, a Utah limited liability company whose members are citizens of Utah; and RAM, a Delaware corporation with its principal place of business in Utah.[2]

---

[1] Celtig is a Tennessee LLC comprised of five members. As of September 26, 2017, four of the members were citizens of Tennessee and one was a citizen of South Carolina.

[2] RAM was formed for the purpose of purchasing graphene from Celtig.

Celtig alleges that Patey operated the three entities with unity of interest and ownership, such that an alter ego relationship existed among them. In support, Celtig alleges that Patey dominated and controlled the three entities and that the three entities were essentially equivalent because they commingled business operations and funds, shared headquarters and employees, and acted interchangeably in relation to the Agreements.

### A. INITIAL NEGOTIATIONS

On or about January 3, 2017, representatives of PSDI, including Patey, traveled to Celtig's offices in Knoxville, Tennessee, to propose a business agreement under which PSDI would purchase graphene produced by Celtig and then resell the graphene on the global market. At the meeting, Patey offered to purchase all the graphene currently in Celtig's inventory for testing. Patey represented that he already had buyers waiting to purchase graphene and asked Celtig to increase its production to meet his demand.

On or about January 23, 2017, PSDI and Celtig executed a Memorandum of Understanding ("MOU"). Celtig agreed to sell 120 kilograms of graphene to PSDI for $78,000.00. After the January meeting, Patey's other company, Evergreen, assumed PSDI's place in the negotiations. On or about March 28, 2017, Evergreen signed two business agreements with Celtig: the Definitive Agreement and the Exclusive License and Distribution Agreement ("Licensing Agreement") (collectively the "Agreements").

### B. DEFINITIVE AGREEMENT

Paragraph 1 of the Definitive Agreement required Evergreen to pre-pay $750,015.00 for the purchase of 833,350 grams of graphene from Celtig within three business days following execution of the agreement. Evergreen then agreed to purchase from Celtig up to two tons per month of graphene over the next three years. The Definitive Agreement established that the parties were to agree on the quality standards, tolerances, and specifications for the graphene sold and

purchased thereunder. The parties agreed that the timing of the deliveries would be decided in writing at a later date.

In return, Celtig agreed to amend its operating agreement to join Evergreen as a voting member, transfer through an appropriate legal instrument a 30% voting ownership interest in Celtig to Evergreen, and guarantee Evergreen at least 30% of the voting membership on the board. *See* ECF No. 17–1 at 3. On May 11, 2017, Celtig sent Evergreen an amended Operating Agreement. Celtig requested Evergreen's comments and requested that Evergreen name the individuals who would sit on the board. Evergreen never responded. To date, Celtig has not amended its Operating Agreement to make Evergreen a member of Celtig, and the five current members of Celtig have not approved the transfer of any voting membership interest to Evergreen.

The parties also assented to certain termination terms contained in the Definitive Agreement. First, the Definitive Agreement states that if Celtig fails to produce or deliver the graphene according to the terms of the Agreements, or if Evergreen is "unable to purchase the year-to-year volumes specified," then either party "may elect to terminate this Agreement and the Exclusive License and Distribution Agreement, terminate Evergreen's board representation and observation rights," and return the 30% ownership interest transferred to Evergreen "for a purchase price of $1.00." ECF No. 17–2 at 5. The Definitive Agreement also states that "[t]his Agreement may also be terminated by the parties for other reasons," and termination would be "achieved by the buyout by one party of the other for an amount determined to be the fair market value of the selling party's interests hereunder." *Id.* The Definitive Agreement then states that the "termination rights" as described above "are in addition to any other remedies available at law or in equity for a breach of this Agreement." *Id.*

### C. LICENSING AGREEMENT

The parties also executed a Licensing Agreement. *See* ECF No. 17–1. Under the terms of the Licensing Agreement, Evergreen agreed to use its best efforts to promote, market, and sell graphene purchased from Celtig and to be responsible for the cost of marketing and selling the graphene. In exchange, Celtig agreed to sell Evergreen all the graphene Celtig could produce. The Licensing Agreement included a provision allowing for termination of the Agreement if the "non-terminating party . . . fails to provide within fourteen (14) days after a request for adequate and reasonable assurance of its financial and operational capacity to perform timely any of its obligations under [the] Agreement." *Id.* at 7.

### D. PERFORMANCE OF THE AGREEMENTS

On or about April 4, 2017, Celtig received a $750,015.00 prepayment from PSDI under paragraph 1 of the Definitive Agreement. On or about April 14, 2017, Patey and David Nielson ("Nielson"), an employee of RAM, requested that Celtig immediately ship one ton of graphene to Evergreen and PSDI. Brian Edwards, the CEO and manager of Celtig, informed PSDI and Evergreen that Celtig did not have that amount of graphene in stock, that the production would take six weeks, and that it would need to acquire some of the requested graphene from a production partner in China called Sinagraphene. Using the $750,015.00 prepayment and an additional $350,000.00 loan, Celtig purchased the raw materials and necessary equipment, and began production. On or about April 30, 2017, Edwards emailed Patey and informed him that Celtig would produce 1,250 kilograms of graphene in May and 1,250 kilograms in June and disclosed the specifications of the graphene, which were consistent with the graphene previously sold to Defendants pursuant to the January 2017 MOU. Celtig did not hear from the Defendants for several weeks.

On or about May 26, 2017, Edwards advised Patey that 1,000 kilograms of graphene would be available for pickup by mid-June and requested a Purchase Order from Patey. When Patey failed to respond, Edwards notified Patey that Evergreen was not complying with the terms of the Agreements and that Evergreen would need to rectify its noncompliance. Patey responded by asking for a "spec verification," which Celtig sent. Upon receipt, Patey represented that Evergreen would issue the Purchase Orders.

On or about June 22, 2017, Evergreen sent an "initial Specification" after production had already been completed. The next day, Edwards notified Evergreen that the graphene was ready for pickup. Between June 29 and July 6, 2017, Edwards and Nielson exchanged emails concerning the status of the shipment. Nielson assured Edwards that Evergreen would pick up and pay for the graphene.

On July 7, 2017, Edwards expressed concern about Evergreen's failure to pick up and pay for the ton of graphene. Edwards advised Evergreen that if payment was not received, Celtig would have to consider selling the graphene outside of the Agreements. In response, on July 7, 2017, Evergreen sent Celtig a purchase order for 96.5% and 99% pure graphene, which was consistent with the quality sold under the January 2017 MOU. The purchase orders did not specify a pick-up date.

On July 10, 2017, Patey sent an email to Edwards and thanked him for the graphene production. The email included no assurances that he would pick up or pay for the graphene. Between July 10 and July 20, 2017, Edwards continued to demand that Evergreen pick up and pay for the graphene. Edwards advised Evergreen that Celtig would not continue producing graphene until it received payment for the graphene already produced. Patey assured Edwards that Evergreen would pay for the graphene. On July 24, 2017, Edwards asked for a timeline of when Evergreen

6

would pick up the graphene. He also demanded payment within fourteen days and a response to the letter in no later than two days. Patey did not respond.

### E. TERMINATION OF THE AGREEMENTS

On August 4, 2017, Edwards, pursuant to paragraph 4 of the Licensing Agreement, *see* ECF No. 17–1 at 7, notified Evergreen that Celtig was demanding proof of Evergreen's financial and operational capability to perform, and demanded a response within 14 days. On August 18, Evergreen asked for a two-week extension to provide proof of its financial wherewithal. Edwards agreed. Two more weeks passed, but Evergreen failed to provide proof of its financial and operational capabilities.

Evergreen never picked up or paid for the metric ton of graphene it ordered. On September 11, 2017, Edwards emailed Patey and informed him that Evergreen was in material breach of the Agreements because of its failure to provide evidence of its financial capabilities and based on its failure to pay for and pick up the graphene. Edwards informed Patey that Celtig was terminating the Agreements. On September 14, 2017, Celtig, through counsel, reiterated that it believed Defendants were in breach and that it was terminating the Agreements. In response, counsel for Defendants sent Celtig a letter threatening suit. ECF No. 17–3. Defendants reiterated this warning in a letter dated September 23, 2017. ECF No. 17–4. Evergreen did not request mediation in either letter.

On September 26, 2017, Celtig filed suit against Evergreen, RAM, PSDI, and Patey, asserting three claims against all Defendants: Count I, breach of contract; Count II, fraud in the inducement; and Count III, declaratory judgment. Under Count III, Plaintiff seeks a declaratory judgment that (1) "Defendants breached the Definitive Agreement by failing to pick up and pay for graphene Evergreen requested pursuant to its Purchase Orders;" (2) "Defendants breached paragraph 4(b) of the Licensing Agreement by failing to provide Celtig with adequate and

reasonable assurances of its financial and operational capability to perform timely its obligation under the Licensing Agreement within the time frame to which the parties agreed;" (3) "Defendants' breaches trigger [Celtig's] right to terminate the Agreements under their respective termination provisions;" (4) "Defendants anticipatorily breached and waived the mediation requirement under paragraph 8(b) of the Licensing Agreement by threatening to file suit against Celtig," thus relieving Celtig of any mediation obligation; and (5) "Defendants are financially unable to comply with their obligations under the Definitive and Licensing Agreements rendering them unable to cure their breaches." Sec. Am. Compl. at ¶¶ 79–85.

Thereafter, Defendants filed their answer and counterclaims against Celtig, and third-party claims against other persons and entities. *See* ECF No. 23. As a discovery sanction on Defendants, the court has entered orders striking all of the Defendants' counterclaims against Celtig, *see* ECF No. 192, and all of the Defendants' third-party claims, *see* ECF No. 190. The court also imposed civil contempt citations on Defendants because of their failure to pay attorneys' fees awarded by the court. *See* ECF No. 191. Defendants filed this Motion for Summary Judgment on January 23, 2019. ECF No. 125.

## II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a claim is required if the party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*,

8

477 U.S. at 322. "Summary judgment on a contract dispute should be granted if the contractual language is unambiguous." *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014) (citing *Gomez v. Am. Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir. 1984)). But "when conflicting evidence is presented such that the ambiguities in a contract could legitimately be resolved in favor of either party, it is for the ultimate finder of fact—not the court on summary judgment—to interpret the contract." *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1215 (10th Cir. 2009). The parties do not dispute that Utah Law governs the interpretation of the Agreements.

### III. DISCUSSION

In its third cause of action, Plaintiff seeks a declaratory judgment that Defendants breached the Agreements, that their breach triggered Plaintiff's right to terminate and seek remedies available under Utah Law, and that Plaintiff is under no obligation to first pursue mediation. Defendants move for summary judgment on Plaintiff's third cause of action on the ground that Plaintiff failed to follow a purportedly exclusive termination condition contained in the Definitive Agreement, under which Plaintiff could only terminate Evergreen's ownership interest in Celtig and have the ownership interest returned to Celtig for $1.00. The court denies the Motion because the termination requirements in the Agreements are not as Defendants claim. Instead, the termination conditions in the Agreements unambiguously run counter to Defendants' contention because they permit Plaintiff to terminate and seek remedies traditionally available under Utah Law for Defendants' alleged breach.

Resolution of this Motion turns on the meaning of the contractual termination provisions. In interpreting a contract under Utah Law, the court will "look to the writing itself to ascertain the parties' intentions," and will "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity*

*Service Corp.*, 54 P.3d 1139, 1144 (Utah 2002) (internal quotations and citation omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* at 1145 (citation omitted). No ambiguity exists where "the language of the contract . . . [is] not susceptible to contrary, tenable interpretations." *Daines v. Vincent*, 190 P.3d 1269, 1277 (Utah 2008) (quoting *WebBank*, 54 P.3d at 1146). When there is no ambiguity as a matter of law, "the meaning of the contract can appropriately be resolved by the court on summary judgment." *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1201 (Utah 1983).

Defendants contend that Plaintiff has only one option to remedy Defendants' alleged breach under the Agreements. According to Defendants' interpretation of paragraph 10 of the Definitive Agreement, Plaintiff may only terminate the Agreements by "terminat[ing] Evergreen's board representation and observation rights, and demand[ing] and receiv[ing] the return of the 30.0% ownership interest transferred to Evergreen . . . for a purchase price of $1.00." ECF No. 125 at 6–7. Plaintiff responds that the contract language on which Defendants rely is a "buyout clause" that merely provides for remedies "in addition to those available under the [Uniform Commercial Code] or by common law." ECF No. 144 at 30–31. Plaintiff argues that the contract terms designating Evergreen's ownership interest and Board representation in Celtig located in paragraph 4 of the Definitive Agreement, *see* ECF No. 17–2 at 3, provided a more specific additional remedy in the event of a breach, but did not displace remedies generally available for breach of contract under Utah Law, ECF No. 144 at 29. In support of this posture, Plaintiff observes that the Definitive Agreement also states: "The termination rights set forth in this paragraph 10 are in addition to any other remedies available at law or in equity for the breach of this Agreement." *Id.* at 30.

10

The court holds that the termination provisions of the Agreements are unambiguous and, in fact, are directly contrary to Defendants' proposed interpretation. Under Utah Law, remedies specified in a contract are "optional unless the remedy is expressly agreed to be exclusive," UTAH CODE ANN. § 70A-2-719(1)(b), and there is a "presumption that clauses prescribing remedies are cumulative rather than exclusive," *id.*, cmt. 2. As noted above, paragraph 10 explicitly states that the specified buyout remedies regarding Evergreen's ownership interest in Celtig are "in addition to any other remedies available at law or equity." ECF No. 17–2 at 5. The court rules that this provision unambiguously enables Celtig to terminate the agreement and sue for relief traditionally available for a breach of contract under Utah Law.[3] Additionally, paragraph 10 explicitly cross-references the Licensing Agreement multiple times. *See* ECF No. 144 at 14–15. And the Licensing Agreement indicates that the parties intended the Definitive Agreement and Licensing Agreement to be integrated agreements. *See* ECF No. 17–1 at 10. Thus, it is clear from the Agreements that the parties intended termination terms contained in the Definitive Agreement to be applicable to the Licensing Agreement. Therefore, a breach of either agreement would give rise to the termination options available in paragraph 10. Pursuant to that paragraph, the nonbreaching party may seek remedies available under Utah Law.

Plaintiffs are also correct that, under Utah Law, the remedies available for breach of commercial sales contracts are governed by the Uniform Commercial Code (UCC). *See* UTAH CODE ANN. § 70A-2-102. Under the UCC, an aggrieved seller may seek a variety of remedies for

---

[3] Indeed, the court notes that contrary to Defendants' assertion, the unambiguous nature of paragraph 10 in the Definitive Agreement may entitle Plaintiff to summary judgment regarding its termination rights under the Agreements. *See Higby Crane Serv., LLC*, 751 F.3d at 1160 ("Summary judgment on a contract dispute should be granted if the contractual language is unambiguous."). If Plaintiff can come forward with sufficient evidence to prove that there is no genuine dispute of material fact that Defendants breached the Agreements when they failed to pay for and pick up the graphene requested in Defendants' purchase orders and failed to provide adequate assurances of its financial wherewithal, summary judgment on Plaintiff's substantive claims may be warranted. Because Plaintiff has not moved for summary judgment, the court does not address these issues.

11

an alleged breach of contract, including withholding delivery, reselling the goods and recovering damages, or cancelling the contract. *Id.* at § 70A-2-703. Celtig has pursued this type of relief in its third cause of action by seeking a declaratory judgment to confirm it appropriately cancelled the Agreements and vindicate the contentions it sets forth in its Second Amended Complaint. *See* Sec. Am. Compl. at ¶¶ 79–85.

In sum, Defendants' Motion for Summary Judgment seeking to limit Plaintiff's relief to the exclusion of remedies available under Utah Law is contrary to the unambiguous terms in the Agreements, and is therefore denied. For Defendants to prevail on a Motion for Summary Judgment, they must come forward with statements of undisputed material fact sufficient to demonstrate that they were not in breach of the Agreements. Because Defendants have not done so, they are not entitled to Summary Judgment.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, Defendants' Motion for Summary Judgment is DENIED.

Signed September 30, 2019

BY THE COURT:

_____
Jill N. Parrish
United States District Court Judge