IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CELTIG, LLC, a Tennessee limited liability company;<br><br>Plaintiff,<br>v.<br><br>AARON A. PATEY, an individual; EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; PSD INTERNATIONAL, LLC, a Utah limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>Case No. 2:17-cv-01086<br><br>District Judge Jill N. Parrish |
| EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Counterclaimants,<br>v.<br><br>CELTIG, LLC, a Tennessee limited liability company;<br><br>Counterclaim-Defendants, | |
| EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Third-Party Plaintiffs,<br>v.<br><br>BRENT BENJAMIN WOODSON; PHILLIP COX; MICHAEL GUNDERSON; DAVID NIELSON; IMPEL SALES, LLC, a Utah Limited Liability Company; and UTAH LAKE LEGACY COALITION LLC, a Utah limited liability company;<br><br>Counterclaim-Defendants | |

This matter is before the court on the partial Motion to Dismiss (the "Motion") filed by Defendants Evergreen Strategies, LLC ("Evergreen"), Relay Advanced Materials, Inc. ("RAM"), PSD International, LLC ("PSDI"), and Aaron A. Patey ("Patey") (collectively "Defendants"). Defendants move to dismiss Plaintiff Celtig LLC's ("Celtig") second cause of action ("Count II"), asserting a claim for fraudulent inducement, in its entirety, and the first and third causes of action, asserting claims for breach of contract ("Count I") and declaratory judgment ("Count III"), as to Defendants RAM, PSDI, and Patey, on the grounds that only Evergreen was a signatory to the contracts at issue. Because Celtig stipulates to the dismissal of Count II, *see* ECF No. 143 at 5, the court addresses only the Motion to Dismiss Counts I and III.

## I.  FACTUAL BACKGROUND[1]

This case arises from a business dispute over the alleged breach of contractual agreements to buy and sell graphene, a substance used in various industrial applications. Celtig, a Tennessee limited liability company,[2] created a process allowing for the mass production of graphene at low cost. Aaron Patey is a citizen of Utah. Patey owned and operated the following entities: Evergreen, a Nevada limited liability company whose members are citizens of Utah; PSDI, a Utah limited liability company whose members are citizens of Utah; and RAM, a Delaware corporation with its principal place of business in Utah.[3]

---

[1] The following facts are drawn from Celtig's second amended complaint, Evergreen and RAM's counterclaim and third-party complaint, the court order denying Defendants' Motion to Dismiss for lack of subject matter jurisdiction, *see* ECF No. 62, and the exhibits attached to the Complaints, which are properly considered on a motion to dismiss. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss.").

[2] Celtig is a Tennessee LLC comprised of five members. As of September 26, 2017, four of the members were citizens of Tennessee and one was a citizen of South Carolina.

[3] RAM was formed for the purpose of purchasing graphene from Celtig.

Celtig alleges that Patey operated the three entities with unity of interest and ownership, such that an alter ego relationship existed between them. In support, Celtig alleges that Patey dominated and controlled the three entities and that the three entities were essentially equivalent because they commingled business operations and funds, shared headquarters and employees, and acted interchangeably in relation to the Agreements.

### A. INITIAL NEGOTIATIONS

On or about January 3, 2017, representatives of PSDI, including Patey, traveled to Celtig's offices in Knoxville, Tennessee, to propose a business agreement under which PSDI would purchase graphene produced by Celtig and then resell the graphene on the global market. At the meeting, Patey offered to purchase all the graphene currently in Celtig's inventory for testing. Patey represented that he already had buyers waiting to purchase graphene and asked Celtig to increase its production to meet his demand.

On or about January 23, 2017, PSDI and Celtig executed a memorandum of understanding ("MOU"). Celtig agreed to sell 120 kilograms of graphene to PSDI for $78,000.00. After the January meeting, Patey's other company, Evergreen, assumed PSDI's place in the negotiations. On or about March 28, 2017, Evergreen signed two business agreements with Celtig: the Definitive Agreement and the Exclusive License and Distribution Agreement ("Licensing Agreement") (collectively the "Agreements").

### B. DEFINITIVE AGREEMENT

Paragraph 1 of the Definitive Agreement required Evergreen to pre-pay $750,015.00 for the purchase of 833,350 grams of graphene from Celtig within three business days following execution of the agreement. Evergreen then agreed to purchase from Celtig up to two tons per month of graphene over the next three years. The Definitive Agreement established that the parties were to agree on the quality standards, tolerances, and specifications for the graphene sold and

3

purchased thereunder. The parties agreed that the timing of the deliveries would be decided in writing at a later date.

In return, Celtig agreed to amend its operating agreement to join Evergreen as a voting member, transfer through an appropriate legal instrument a 30% voting ownership interest in Celtig to Evergreen, and guarantee Evergreen at least 30% of the voting membership on the board. *See* ECF No. 17–1 at 3. On May 11, 2017, Celtig sent Evergreen an amended Operating Agreement. Celtig requested Evergreen's comments and requested that Evergreen name the individuals who would sit on the board. Evergreen never responded. To date, Celtig has not amended its Operating Agreement to make Evergreen a member of Celtig, and the five current members of Celtig have not approved the transfer of any voting membership interest to Evergreen.

The parties also assented to certain termination terms contained in the Definitive Agreement. First, the Definitive Agreement states that if Celtig fails to produce or deliver the graphene according to the terms of the Agreements, or if Evergreen is "unable to purchase the year-to-year volumes specified," then either party "may elect to terminate this Agreement and the Exclusive License and Distribution Agreement, terminate Evergreen's board representation and observation rights," and return the 30% ownership interest transferred to Evergreen "for a purchase price of $1.00." ECF No. 17–2 at 5. The Definitive Agreement also states that "[t]his Agreement may also be terminated by the parties for other reasons," and termination would be "achieved by the buyout by one party of the other for an amount determined to be the fair market value of the selling party's interests hereunder." *Id.* The Definitive Agreement then states that the "termination rights" as described above "are in addition to any other remedies available at law or in equity for a breach of this Agreement." *Id.*

### C. LICENSING AGREEMENT

The parties also executed a Licensing Agreement. *See* ECF No. 17–1. Under the terms of the Licensing Agreement, Evergreen agreed to use its best efforts to promote, market, and sell graphene purchased from Celtig and to be responsible for the cost of marketing and selling the graphene. In exchange, Celtig agreed to sell Evergreen all the graphene Celtig could produce. The Licensing Agreement included a provision allowing for termination of the Agreement if the "non-terminating party . . . fails to provide within fourteen (14) days after a request for adequate and reasonable assurance of its financial and operational capacity to perform timely any of its obligations under [the] Agreement." *Id.* at 7.

### D. PERFORMANCE OF THE AGREEMENTS

On or about April 4, 2017, Celtig received a $750,015.00 prepayment from PSDI under paragraph 1 of the Definitive Agreement. On or about April 14, 2017, Patey and David Nielson ("Nielson"), an employee of RAM, requested that Celtig immediately ship one ton of graphene to Evergreen and PSDI. Brian Edwards, the CEO and manager of Celtig, informed PSDI and Evergreen that Celtig did not have that amount of graphene in stock, that the production would take six weeks, and that it would need to acquire some of the requested graphene from a production partner in China called Sinagraphene. Using the $750,015.00 prepayment and an additional $350,000.00 loan, Celtig purchased the raw materials and necessary equipment, and began production. On or about April 30, 2017, Edwards emailed Patey and informed him that Celtig would produce 1,250 kilograms of graphene in May and 1,250 kilograms in June and disclosed the specifications of the graphene, which were consistent with the graphene previously sold to Defendants pursuant to the January 2017 MOU. Celtig did not hear from the Defendants for several weeks.

On or about May 26, 2017, Edwards advised Patey that 1,000 kilograms of graphene would be available for pickup by mid-June and requested a Purchase Order from Patey. When Patey failed to respond, Edwards notified Patey that Evergreen was not complying with the terms of the Agreements and that Evergreen would need to rectify its noncompliance. Patey responded by asking for a "spec verification," which Celtig sent. Upon receipt, Patey represented that Evergreen would issue the Purchase Orders.

On or about June 22, 2017, Evergreen sent an "initial Specification" after production had already been completed. The next day, Edwards notified Evergreen that the graphene was ready for pickup. Between June 29 and July 6, 2017, Edwards and Nielson exchanged emails concerning the status of the shipment. Nielson assured Edwards that Evergreen would pick up and pay for the graphene.

On July 7, 2017, Edwards expressed concern about Evergreen's failure to pick up and pay for the ton of graphene. Edwards advised Evergreen that if payment was not received, Celtig would have to consider selling the graphene outside of the Agreements. In response, on July 7, 2017, Evergreen sent Celtig a purchase order for 96.5% and 99% pure graphene, which was consistent with the quality sold under the January 2017 MOU. The purchase orders did not specify a pick-up date.

On July 10, 2017, Patey sent an email to Edwards and thanked him for the graphene production. The email included no assurances that he would pick up or pay for the graphene. Between July 10 and July 20, 2017, Edwards continued to demand that Evergreen pick up and pay for the graphene. Edwards advised Evergreen that Celtig would not continue producing graphene until it received payment for the graphene already produced. Patey assured Edwards that Evergreen would pay for the graphene. On July 24, 2017, Edwards asked for a timeline of when Evergreen

6

would pick up the graphene. He also demanded payment within fourteen days and a response to the letter in no later than two days. Patey did not respond.

### E. TERMINATION OF THE AGREEMENTS

On August 4, 2017, Edwards, pursuant to paragraph 4 of the Licensing Agreement, *see* ECF No. 17–1 at 7, notified Evergreen that Celtig was demanding proof of Evergreen's financial and operational capability to perform, and demanded a response within 14 days. On August 18, Evergreen asked for a two-week extension to provide proof of its financial wherewithal. Edwards agreed. Two-more weeks passed, but Evergreen failed to provide proof of its financial and operational capabilities.

Evergreen never picked up or paid for the metric ton of graphene it ordered. On September 11, 2017, Edwards emailed Patey and informed him that Evergreen was in material breach of the Agreements because of its failure to provide evidence of its financial capabilities and based on its failure to pay for and pick up the graphene. Edwards informed Patey that Celtig was terminating the Agreements. On September 14, 2017, Celtig, through counsel, reiterated that it believed Defendants were in breach and that it was terminating the Agreements.

In response, counsel for Defendants sent Celtig a letter threatening suit. ECF No. 17–3. Defendants reiterated this warning in a letter dated September 23, 2017. ECF No. 17–4. Evergreen did not request mediation in either letter. Thereafter, Celtig filed suit against Evergreen, RAM, PSDI, and Patey on September 26, 2017, asserting three claims against all Defendants: Count I, breach of contract; Count II, fraud in the inducement; and Count III, declaratory judgment. Because Celtig has stipulated to dismiss Count II, *see* ECF No. 143 at 5, the court addresses the Motion only as to Counts I and III.

## II. DISCUSSION

Defendants move to dismiss part of Plaintiffs' Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Count I asserts a claim for breach of the Definitive Agreement and the Licensing Agreement and Count III seeks a declaratory judgment that Celtig properly terminated the Agreements because Defendants breached the Agreements. Defendants allege that these claims should be dismissed against RAM, PSDI, and Patey because Defendants argue that Celtig's claims can only be asserted against Evergreen, which was the signatory to the Agreements. Celtig opposes the motion on the grounds that all four Defendants—Evergreen RAM, PSDI, and Patey—were alter egos of each other under Utah law and, accordingly, Celtig argues that all Defendants can be held jointly and severally liable for the alleged conduct of Evergreen.

First, the court notes that although Defendants filed their Motion as a motion to dismiss for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6), the Motion was filed on January 21, 2019, more than a year after the pleadings closed. This Motion is not properly brought as a motion to dismiss because FED. R. CIV. P. 12(b) states that a "motion asserting any of these defenses," including an alleged failure to state a claim, "must be made before pleading if a responsive pleading is allowed." Only a motion for judgment on the pleadings under FED. R. CIV. P. 12(c) may be brought "[a]fter the pleadings are closed[.]" Thus, this filing was improper, and the court is authorized to deny the Motion on this ground alone. Nevertheless, the court addresses the merits of Defendants' Motion because Celtig did not move to strike. The court first addresses whether Celtig has plausibly alleged that the Defendants are alter egos and then whether the breach of contract and the declaratory judgment claims are properly brought against Patey, Ram, and PSDI.

### A. LEGAL STANDARD

The court evaluates a Fed. R. Civ. P. 12(b)(6) motion using the same standard as a Fed. R. Civ. P. 12(c) motion. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (citing *Park*

8

*Univ. Enters. v. Am. Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "At the motion-to-dismiss stage, [the court] must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Albers v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 771 F.3d 697, 700 (10th Cir. 2014) (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013)). "[A] court should disregard all conclusory statements of law [in the complaint] and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

## B. ALTER EGO THEORY

Evergreen is the only defendant that signed the Definitive Agreement and the Licensing Agreement. However, Celtig asks the court to "pierce the corporate veil" to reach the other three defendants—Patey, PSDI, and RAM—and find them to be alter egos of each other. "Ordinarily a corporation is regarded as a legal entity, separate and apart from its stockholders." *Dockstader v. Walker*, 510 P.2d 526, 528 (Utah 1973). But under the "well-established practice of piercing the corporate veil, 'the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the corporation.'" *United States v. Badger*, 818 F.3d 563, 568 (10th Cir. 2016) (quoting *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993)). State law governs this determination. *See id.* In Utah,[4] the corporate form may be disregarded if two elements are present:

---

[4] The parties do not address choice of law but appear to stipulate to Utah law for the purpose of this Motion. Although the choice of law clause in the Agreements specifies Utah law as the proper authority for "interpret[ing] and constru[ing]" the Agreements, ECF No. 17–1 at 10, that clause does not necessarily dictate the applicable law for other issues in this case, including the alter ego dispute. *See Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1575

9

> (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.

*Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979). Under this test, "there is no single factor that alone justifies piercing the corporate veil" and "a careful review of the entire relationship between various corporate entities and their directors and officers" is the overarching inquiry. 1 Fletcher Cyc. Corp. § 41 (2019).

In their Motion to Dismiss, Defendants do not challenge Celtig's assertion that the four Defendants are alter egos. Instead, Defendants merely argue that such an allegation, regardless of its merit, cannot create substantive liability for RAM, PSDI, and Patey, which are not signatories to the Agreements. *See* ECF No. 124 at 10. Then, in their reply, Defendants summarily argue that Celtig has improperly pleaded that the parties are alter egos in the first place. *See* ECF No. 147 at 4–5. Although Defendants' arguments against the sufficiency of Celtig's pleadings concerning the existence of an alter ego relationship are improperly raised for the first time in their reply brief, *see Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir. 1994), the court briefly addresses the sufficiency of Celtig's alter ego allegations.

1. **Unity of Interest and Ownership**

First, the court addresses whether the Defendant-entities and Mr. Patey have operated with "such unity of interest and ownership" that their "separate personalities . . . no longer exist."

---

n.18 (10th Cir. 1990) (discussing the choice of law issues regarding standards for piercing the corporate veil). In future briefings, the parties are advised to consider whether Utah law is the appropriate law to apply to matters in this case. This court, sitting in diversity, applies Utah choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). And Utah follows the Restatement (Second) of Conflict of Laws, which applies the law of the most significant relationship in contract cases. *See, e.g.*, *Forsman v. Forsman*, 779 P.2d 218, 219–20 (Utah 1989); *Records v. Briggs*, 887 P.2d 864, 867 (Utah Ct. App. 1994).

*Norman*, 596 P.2d at 1030. "The first prong has been called the 'formalities requirement,' referring to the corporate formalities required by statute." *Jones & Trevor Mktg., Inc. v. Lowry*, 284 P.3d 630, 635–36 (Utah 2012) (quoting *Messick v. PHD Trucking Serv., Inc.*, 678 P.2d 791, 794 (Utah 1984)). In *Jones & Trevor Mktg., Inc. v. Lowry*, the Utah Supreme Court adopted as "helpful tools" seven so-called "*Colman* factors" that bear on the unity of interest and ownership analysis. *Id.* at 636 (relying on *Colman v. Colman*, 743 P.2d 782, 786 (Utah Ct. App. 1987)).[5] The factors are:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; and (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders[.]

*Id*. The court recognizes that the *Colman* factors are "not required elements," but they assist the court with its overall task of "evaluat[ing] the entire relationship between a corporation and its officers in determining whether to pierce the corporate veil" or find an alter ego relationship. *Lodges at Bear Hollow Condo. Homeowners Ass'n, Inc. v. Bear Hollow Restoration, LLC*, 344 P.3d 145, 150 (Utah Ct. App. 2015) (quoting *Jones & Trevor Mktg., Inc.*, 284 P.3d at 640). There is no specific formula of *Colman* factors that a party must establish, and "it is possible that evidence of even one of the *Colman* factors may be sufficient to" demonstrate a unity of interest under part one of the alter ego inquiry. *Jones & Trevor Mktg., Inc.*, 284 P.3d at 638.

Here, Celtig makes two separate allegations regarding the four defendants' unity of interest, arguing that Mr. Patey dominated and controlled all the entities and that the boundaries

---

[5] *Colman* articulated eight factors. In *Jones & Trevor Mktg., Inc. v. Lowry*, the Utah Supreme Court made clear that "the *Colman* factors" are "useful considerations to aid courts in determining whether to pierce the corporate veil[;]" however, the court did not adopt the factors as required elements. 284 P.3d at 636. Additionally, the *Jones & Trevor Mktg., Inc.* court made clear that the first seven factors were the only ones relevant to the "unity of interest" analysis, while the eighth factor merely restates the second part of the alter ego liability test concerning any inequitable conduct or injustices that would result from not piercing the corporate veil. *Id.* at 637.

11

between the entities are fluid and artificial. The court concludes that the applicable *Colman* factors weigh in favor of finding that Plaintiffs have plausibly pled that Defendants are alter egos of one another.[6]

### a. Patey

First, Celtig alleges that Patey so dominated and controlled the Defendant-entities that the corporate forms should be disregarded. The court construes Celtig's argument to be that Patey's dominance and control of Evergreen, if true, forms a basis for implicating the second, fifth, and seventh *Colman* factors. Defendants respond that such an allegation could be made of any "individual who owns a controlling interest in multiple companies," and, without actually disputing the contentions made by Celtig, concludes that the dominance or control of one entity over another entity is insufficient to breach the veil or impose alter ego liability. *See* ECF No. 147 at 4. It is true that a positive finding on the unity of interest and ownership prong is alone not enough to pierce the corporate veil and hold Patey liable. *See Jones & Trevor Mktg., Inc.*, 284 P.3d at 636–37. But Celtig's uncontested "unity of interest" argument, combined with potential fraud or an inequitable result, would be enough. *See id.* In other words, Defendants simply argue that a unity of interest and ownership between Mr. Patey and Evergreen, PSDI, and RAM does not make them alter egos without disputing that such a unity of interest and ownership exists. Thus, the court finds that Celtig has sufficiently pled the first element of the corporate veil test with regard to Patey.

---

[6] The court notes that the issue of undercapitalization is likely also relevant here because Defendants have made multiple representations to the court that the corporate entities are purportedly insolvent. *See, e.g.*, ECF Nos. 164, 165. However, neither party has come forward with any evidence regarding the financial status of the Defendants. *See* ECF No. 191 at 4. Therefore, the court does not consider this factor for purposes of this Motion to Dismiss.

### b. PSDI and RAM

Second, the court examines whether Celtig has plausibly pled that PSDI and RAM are alter egos of Evergreen. Under the seventh *Colman* factor, courts may consider whether entities "commingled funds" and overlapped in operations and resources such that the corporations "were used as a facade" for the operations of the alter ego. *Colman*, 743 P.2d at 788; *cf. Baker v. Dataphase, Inc.*, 781 F. Supp. 724, 736 (D. Utah 1992) (finding that the lack of "commingling of funds" between purported alter ego corporations weighed against imposing alter ego liability under Utah law). Celtig argues that the boundaries between Evergreen, PSDI, and RAM were so thin and fluid that the corporate formalities are artificial and all three should be treated as alter ego entities controlled by Patey. This allegation calls for a slightly different analysis than the former analysis regarding Patey's alter ego status because Celtig is arguing that three separate entities should be treated as interchangeable despite none of the entities themselves having exerted control over the others. In opposition, Defendants respond that the three entities acted with a common goal, not a unity of interest.

The court finds that Celtig's factual allegations support its claim that RAM, Evergreen, and PSDI functioned interchangeably and had a unity of interest. Specifically, Celtig plausibly alleged several instances of overlap between the entities that demonstrate a unity of interest among RAM, PSDI, Patey, and Evergreen. First, Celtig alleges that all three corporations commingled funds, shared resources and employees, and were operated from the same offices and headquarters in Lindon, Utah. *See* Sec. Am. Compl. ¶¶ 2–5. Second, although Evergreen signed the Agreements, PSDI negotiated them, signed the January 2017 MOU, and purchased the original graphene under the MOU. *Id.* at ¶¶ 19–22. Third, Evergreen reserved the right to assign the Licensing Agreement as well as the interests, benefits, and obligations from its Definitive Agreement to RAM and/or PSDI. *See* ECF No. 17–1 at 2. Fourth, RAM and Evergreen *both* threatened to sue Celtig for

terminating the Agreements. *See* Sec. Am. Compl. ¶ 60. In fact, RAM asserted a claim for damages under the Agreements in the Third-Party Complaint and Counterclaim. *See* Countercl. & Third-Party Compl. ¶¶ 2–5. Accordingly, Celtig has plausibly pled that the three corporations acted interchangeably under Patey's control and in complete disregard of corporate formalities.

In sum, Celtig has alleged that a unity of interest and ownership existed between Evergreen and Patey because of Patey's complete control over Evergreen. Celtig has further alleged that Patey had the same or similar relationship with RAM and PSDI,[7] which acted interchangeably with Evergreen by commingling operations and funds; overlapping in physical location; sharing employees, operational overhead, and resources; and substituting one for the other in negotiating, participating in, and suing under the Agreements that were ultimately signed by Evergreen. Accepting Celtig's allegations as true, the court finds that Celtig has plausibly pled a unity of interest and ownership among the four Defendants under part one of the alter ego test.

### 2. Risk that Observing the Corporate Form Would Sanction a Fraud, Promote Injustice, or Cause an Inequitable Result

Next, Celtig must have plausibly pleaded that the court's observance of the corporate form would sanction a fraud, promote injustice, or cause an inequitable result. This second prong "has been called the 'fairness requirement,' and it 'is addressed to the conscience of the court.'" *Jones & Trevor Mktg., Inc.*, 284 P.3d at 635 (quoting *Salt Lake City Corp. v. James Constructors, Inc.*, 761 P.2d 42, 47 (Utah Ct. App. 1988)). "Under the second prong, '[i]t is not necessary that the

---

[7] The court notes that Celtig has sufficiently pled that Patey exercised control over Evergreen, PSDI, and RAM, and Defendants have not contested this assertion. And even if Defendants can prove at a later stage that other individuals had some operational control over PSDI and/or RAM (as Defendants asserted during oral argument on a civil contempt citation hearing, *see* ECF No. 191), that may not negate the alter ego relationship alleged between the entities. After all, the *Norman* test for alter ego liability asks whether a corporation "is the alter ego of one *or a few individuals*." *Jones & Trevor Mktg., Inc.*, 284 P.3d at 635 (citing *Norman*, 596 P.2d at 1030). Therefore, the "policy reasons for this consideration" to determine whether separate entities have a sufficient unity of interests and ownership to be deemed alter egos will "apply equally whether the entity is made up of one person or several." *Krstevski v. Welsh*, No. 1:16-CV-15 TS, 2016 WL 4532095, at *7 (D. Utah Aug. 29, 2016) (applying Utah law).

plaintiff prove actual fraud, but must only show that failure to pierce the corporate veil would result in an injustice.'" *Id.* at 635–36 (quoting *Colman*, 743 P.2d at 786) (alteration in original).

Celtig alleges that "an injustice would result unless the separate legal existences of the Defendants are disregarded and they are held jointly and severally liable[.]" Sec. Am. Compl. ¶ 7. Defendants challenge the sufficiency of this allegation by asserting that this element was "not properly plead." ECF No. 147 at 5. But Defendants fail to make any cognizable arguments explaining *why* the element is not properly pled, and the court will not create an argument for them. Regardless, the court finds that inequity may result should the corporate form be used to shield three of the four Defendants from judgment when all appear from the face of Plaintiff's Complaint to have acted in concert. The court finds that Celtig has plausibly pled that the corporate veil should be disregarded as to all four Defendants.

## C. SUBSTANTIVE CLAIMS

The court now turns to whether the alter ego entities can be held liable to Celtig for Evergreen's breach of the Agreements. To redress its alleged harm, Celtig seeks two forms of relief: (1) damages for the alleged breach of contract; and (2) equitable relief in the form of a declaratory judgment. Although Celtig seeks the two types of relief under two different claims, Count I and Count III, the parties do not differentiate between the two claims in their briefing.[8] Thus, for purposes of this Motion, the court does not distinguish between them either, but rather addresses only whether the three Defendants that were not signatories to the Agreements may be held liable for Evergreen's alleged breach.

---

[8] In fact, Defendants' Motion to Dismiss barely discusses the grounds for dismissal of Counts I and III. *See* ECF No. 124 at 10–11.

Defendants argue that only parties to a contract may be held liable for breaching the contract, regardless of whether the court pierces the corporate veil or finds that entities are alter egos. In support, Defendants rely on *Bushnell v. Barker*, 274 P.3d 968 (Utah 2012), a Utah Supreme Court case holding that an alter ego theory does not make the alter ego a "defaulting party" under a contract, but merely allows the third-party to be held personally liable for the contracting party's default. *Id.* at 971. In so holding, the Utah Supreme Court noted that "[a]n alter ego claim 'is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance, but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation.'" *Bushnell*, 274 P.3d at 971 (quoting *Shaoxing Cnty. Huayue Imp. & Exp. v. Bhaumik*, 120 Cal. Rptr. 3d 303, 310 (2011)). According to Defendants, the *Bushnell* decision prevents Celtig from naming Patey, PSDI, and RAM in the breach of contract claims—even if they are alter egos—because Evergreen was the only Defendant that was a signatory to the Agreements.

Defendants' interpretation of *Bushnell* ignores the issue that was actually before the Utah Supreme Court, which was whether the particular alter ego defendant in that case could be held liable for the prevailing party's attorney's fees under the attorney fee provision of the applicable contract and Utah Code § 78B-5-826.[9] In reaching its decision, the court determined that while the alter ego defendant could be personally liable for the actual breach by the contracting defendant, the alter ego defendant was not a "defaulting party" as defined by the *contract* and thus could not be held liable for an award of attorney's fees. *Bushnell*, 274 P.3d at 971. Thus, *Bushnell* did not hold that a breach of contract claim cannot be maintained against alter ego defendants; rather, it

---

[9] UTAH CODE ANN. § 78B-5-826 "is triggered only when the provisions of the contract would allow at least one party to recover fees if that party had prevailed under its theory of the case." *Bushnell*, 274 P.3d at 971.

held only that an alter ego defendant was not covered by the attorney's fee provision of the contract at issue in that case. *Id.*

With this in mind, the court returns to the *Bushnell* holding that alter ego claims are "procedural" rather than "substantive." *See id*. The Defendants argue that the Utah Supreme Court held that alter ego defendants cannot be named in substantive claims. But what the Utah Supreme Court actually stated was that a plaintiff cannot allege an "alter ego" claim in its complaint without asserting an underlying substantive claim for which the corporate entity may be held liable. Such underlying claims may include, for example, a breach of contract claim, or any business tort claim. *See Jones & Trevor Mktg., Inc.*, 284 P.3d at 633–34 (upholding district court's grant of summary judgment and dismissal of claims for conversion, fraudulent misrepresentation, and intentional interference against individual defendants because plaintiff could not prove its alter ego theory of liability as to those individual defendants). But the court will not hold alter ego defendants liable without some underlying action by the corporate entity. *See Garth O. Green Enterprises, Inc. v. Harward*, No. 2:15-CV-00556-DN-EJF, 2017 WL 1184024, at *14 (D. Utah Mar. 29, 2017) (dismissing an "alter ego" claim because "there are no claims adequately pled against [the corporate defendant].").

In this case, the Defendants have not challenged the adequacy of the underlying substantive claims for breach of contract and declaratory relief, only whether the alter ego defendants may be named. The court disagrees with Defendants and holds that Celtig has properly stated a claim that the alter ego defendants may be held liable for the underlying actions of Evergreen. The court therefore denies Defendants' Motion as to Counts I and III.

## III.     CONCLUSION AND ORDER

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Count II of the Second Amended Complaint is dismissed with prejudice. Counts I and III remain against all Defendants.

Signed September 30, 2019

BY THE COURT:

_____
Jill N. Parrish
United States District Court Judge