IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CELTIG, LLC, a Tennessee limited liability company;<br><br>Plaintiff,<br>v.<br><br>AARON A. PATEY, an individual; EVERGREEN STRATEGIES, LLC, a Nevada limited liability company; PSD INTERNATIONAL, LLC, a Utah limited liability company; and RELAY ADVANCED MATERIALS, INC., a Delaware Corporation;<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-01086<br><br>District Judge Jill N. Parrish |

This contract dispute is before the court on Plaintiff Celtig, LLC's ("Plaintiff" or "Celtig") Motion for Summary Judgment (the "Motion"). Plaintiff alleges that there remain no genuine disputes of material fact that Defendants Evergreen Strategies, LLC ("Evergreen"), Relay Advanced Materials, Inc. ("RAM"), PSD International, LLC ("PSDI"), and Aaron A. Patey ("Patey") (collectively "Defendants") breached their contract with Celtig. After considering the parties' briefing, the court GRANTS Plaintiff's Motion.

I. BACKGROUND[1]

This case arises from a business dispute over the alleged breach of contractual agreements to buy and sell graphene, a substance used in various industrial applications. Celtig, a Tennessee

---

[1] Defendants contest Plaintiff's version of the facts by intermittently claiming that the evidence on which Plaintiff relies contains hearsay or is irrelevant. *See, e.g.*, ECF No. 213 at 3–17. Although Defendants do not explicitly invoke the federal rules or make any legal arguments concerning why the court should not rely upon Plaintiff's proffered evidence, the court interprets Defendants' argument to be based on Federal Rule of Civil Procedure 56(c)(2), which states that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." But that "does not mean that [summary judgment] evidence must be submitted 'in a form that would be admissible at trial.'" *Trevizo v. Adams*, 455 F.3d 1155, 1160

limited liability company, created a process allowing for the mass production of graphene at low cost. Aaron Patey is a citizen of Utah. Patey owned and operated the following entities: Evergreen, a Nevada limited liability company whose members are citizens of Utah; PSDI, a Utah limited liability company whose members are citizens of Utah; and RAM, a Delaware corporation with its principal place of business in Utah. The court has previously ruled that Celtig plausibly alleged that these four entitles are alter egos of each other. *See Celtig, LLC v. Patey*, No. 2:17-CV-01086, 2019 WL 4779285, at *5–7 (D. Utah Sept. 30, 2019).

### A. INITIAL NEGOTIATIONS

On or about January 3, 2017, representatives of PSDI, including Patey and an officer of PSDI named David Nielsen ("Nielsen"), traveled to Celtig's office in Knoxville, Tennessee to propose a business agreement under which PSDI would purchase graphene produced by Celtig and then resell the graphene on the global market. At the meeting, Patey offered to purchase all

---

(10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Rather, only "the content or substance of the evidence must be admissible." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)). It is the objecting party's burden to "make its objection clear; the trial judge need not imagine all the possible grounds for an objection." *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 960–61 (10th Cir. 1993). And the party opposing summary judgment must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' *designate* 'specific facts showing that there is a genuine issue for trial.'" *Thomas v. Wichita Coca-Cola Bottling Co.*, 986 F.2d 1022, 1024 (10th Cir. 1992) (quoting *Celotex*, 477 U.S. at 324) (emphasis in original). In sum, "[a] properly submitted summary judgment motion cannot be defeated by mere allegations or denials. Rather, to withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *S.E.C. v. Smart*, 678 F.3d 850, 858 (10th Cir. 2012) (citations, quotations, and alterations omitted). Here, Defendants offer only conclusory objections to Plaintiff's statement of facts without supplying any contrary version of the events from a person with relevant knowledge. Such conclusory objections devoid of factual support or analysis are insufficient to raise a genuine dispute of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("[T]he nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."). Thus, the court recites Plaintiff's account of the facts—supported by substantial documentary and testimonial evidence—as undisputed. *See* FED. R. CIV. P. 59(e)(2)–(3).

2

the graphene currently in Celtig's inventory for testing and reiterated Defendants' offer over email. Patey represented that he already had buyers waiting to purchase graphene and asked Celtig to increase its production to meet Defendants' demand.

### B. THE AGREEMENT

On or about January 23, 2017, PSDI and Celtig executed a Memorandum of Understanding ("MOU") to purchase an initial supply of graphene. Celtig agreed to sell 120 kilograms of graphene to PSDI for $78,000.00. Under the MOU, the parties then undertook a thirty-day due diligence period and Defendants had samples of the graphene tested for approval at a third-party facility. After the January meeting and execution of the MOU, Patey's other company, Evergreen, assumed PSDI's place in the negotiations with Celtig. On or about March 28, 2017, Patey, on behalf of Evergreen, signed two contracts with Celtig: the Definitive Agreement and the Exclusive License and Distribution Agreement ("Licensing Agreement") (collectively the "Agreement"). As the court has previously ruled, these two contracts are integrated and form one Agreement under Utah law. *See Celtig, LLC v. Patey*, No. 2:17-CV-01086, 2019 WL 4751918, at *5 (D. Utah Sept. 30, 2019).

#### 1. The Definitive Agreement Terms

The Definitive Agreement establishes Defendants' obligation to purchase graphene from Celtig. Paragraph one of the Definitive Agreement required Evergreen to pre-pay $750,015.00 for the purchase of 833,350 grams of graphene from Celtig within three business days following execution of the agreement. ECF No. 212–3 at 2. The parties were to agree on the quality standards, tolerances, and specifications for the graphene sold and purchased thereunder, and agreed that the timing of the deliveries would be decided in writing at a later date. *Id.* Under Paragraph five, Defendants promised to "purchase all of output from [Celtig's] production facility during the production ramp-up period" as well as $20,000,000 worth of graphene for the first twelve-month

3

purchase period, $40,000,000 worth of graphene for the second twelve-month period, and $60,000,000 for the third twelve-month purchase period. *Id.* at 3. Under paragraph three, Defendants also agreed "to provide support and infrastructure for Global Supply Chain management" and "to provide sales, and marketing services, contracting and managing any and all Graphene purchase agreements as specified in the [Licensing Agreement]." *Id.*

In return, Celtig agreed to amend its operating agreement to join Evergreen as a voting member of Celtig, transfer through an appropriate legal instrument a 30% voting ownership interest in Celtig to Evergreen, and guarantee Evergreen at least 30% of the voting membership on the board. *Id.* at 3. Accordingly, Celtig sent Evergreen a draft amended Operating Agreement on May 11, 2017. Celtig asked for Evergreen's comments and requested that Evergreen name the representative who would sit on Celtig's board. But Evergreen never responded. As a result, Celtig has not amended its Operating Agreement to make Evergreen a member of Celtig, and the five current members of Celtig have not approved the transfer of any voting membership interest to Evergreen.

The parties also assented to certain termination terms in the Definitive Agreement. First, the Definitive Agreement states that if Celtig fails to produce or deliver the graphene according to the terms of the Agreement, or if Evergreen is "unable to purchase the year-to-year volumes specified," then either party "may elect to terminate this Agreement and the Exclusive License and Distribution Agreement, terminate Evergreen's board representation and observation rights," and return the 30% ownership interest transferred to Evergreen "for a purchase price of $1.00." ECF No. 212–3 at 5. The Definitive Agreement also states that "[t]his Agreement may also be terminated by the parties for other reasons," and termination would be "achieved by the buyout by one party of the other for an amount determined to be the fair market value of the selling party's

4

interests hereunder." *Id.* The Definitive Agreement then states that the specified "termination rights" as described above "are in addition to any other remedies available at law or in equity for a breach of this Agreement." *Id.*

### 2. The Licensing Agreement Terms

Under the terms of the Licensing Agreement, Evergreen repeated its promise from the Definitive Agreement to use its "best efforts" to "promote, market, and sell" the graphene purchased from Celtig and to "regularly purchas[e] [graphene] from Celtig in sufficient quantities to meet the reasonably anticipated inventory and purchase demand for such." ECF No. 212–4 at 3–4. In exchange, Celtig agreed to sell Evergreen all the graphene that Celtig could produce. The Licensing Agreement included a provision allowing for termination of the Agreement if the "non-terminating party . . . fails to provide within fourteen (14) days after a request for adequate and reasonable assurance of its financial and operational capacity to perform timely any of its obligations under this Agreement." *Id.* at 7.

### C. PERFORMANCE OF THE AGREEMENTS

On or about April 4, 2017, Celtig received a $750,015.00 prepayment from PSDI under paragraph one of the Definitive Agreement. On or about April 14, 2017, Patey and Nielsen requested that Celtig immediately ship one ton of graphene to Evergreen and PSDI. Brian Edwards ("Edwards"), the CEO and manager of Celtig, informed PSDI and Evergreen that Celtig did not have that amount of graphene in stock, that the production would take six weeks, and that it would need to acquire some of the requested graphene from a production partner in China called Sinagraphene. Defendants did not object to this plan. Using the $750,015.00 prepayment and the proceeds of an additional $350,000.00 loan, Celtig purchased the raw materials and equipment necessary to begin production. On or about April 30, 2017, Edwards emailed Patey and informed him that Celtig would produce 1,250 kilograms of graphene in May 2017 and 1,250 kilograms in

5

June 2017, and disclosed the specifications of the graphene, which were consistent with the graphene previously sold to Defendants under the January 2017 MOU. On May 18, 2017, Edwards contacted Patey and Nielsen and requested that Defendants immediately pay for their graphene order. Nielsen indicated that he would speak to Patey and get back to Edwards. But Celtig did not hear from the Defendants for several weeks.

On or about May 26, 2017, Edwards advised Defendants that 1,000 kilograms of graphene would be available for pickup by mid-June and requested a Purchase Order. When Defendants failed to respond, Edwards notified Defendants that they were not complying with the terms of the Agreement and that Evergreen would need to rectify its noncompliance. Edwards stated in his email to Defendants that he had information that Defendants' "funding for this project has, at least temporarily, fallen through," "that Evergreen is in default" concerning a different business deal, and Celtig "ha[s] become increasingly concerned about Evergreen's financial ability to keep the purchase commitments it has made to Celtig." ECF No. 212–8 at 2–3. Edwards stated that based on this information, "Celtig must conclude that Evergreen is failing to comply with the terms of its agreement with Celtig" and that "[t]his situation must be rectified soon." *Id.* at 3. Patey responded by asking for a "spec verification," which Celtig sent. Upon receipt, Patey represented that Evergreen would issue the Purchase Order but did not provide any information regarding the Defendants' financial wherewithal. *See* ECF No. 212–9.

On or about June 22, 2017, Evergreen sent an "initial Specification" of the product after Celtig's production had already been completed. ECF No. 212–10. The next day, Edwards notified Defendants that the 1,000kg of graphene met specification requirements and was ready for pick-up at Celtig's facility in South Carolina. ECF No. 212–11. Between June 29 and June 30, 2017, Edwards and Nielsen exchanged emails concerning when Defendants would take delivery of the

6

graphene and the continued lack of a Purchase Order. ECF No. 212–12. Nielsen assured Edwards that Evergreen would pick up and pay for the graphene. *Id.*

But Defendants failed to issue the promised Purchase Order or take delivery of the graphene. On July 6, 2017, Edwards expressed concern about Defendants' behavior and stated that the "lack of clear communication from [Defendants] is making me nervous" and that if Defendants could not perform under the Agreement, Celtig may "have to make a hard decision about selling this batch of graphene outside of our agreement or else raising additional capital from external sources to pay my bills." ECF No. 212–13. In response, on July 7, 2017, Evergreen, through RAM, sent Celtig a Purchase Order for 96.5% and 99% pure graphene, which was consistent with the quality sold under the January 2017 MOU. ECF No. 212–15. But the Purchase Order did not specify a pick-up date. *See id.*

On July 10, 2017, Patey sent an email to Edwards thanking him for the graphene production, but the email included no assurances that Defendants would pick up or pay for the graphene and provided no proof of Defendants' financial or operational capabilities. ECF No. 212–16. Between July 10 and July 20, 2017, Edwards continued to demand that Evergreen pick up and pay for the graphene. ECF No. 212–17. Edwards advised Evergreen that Celtig would not continue producing graphene until it received payment for the graphene already produced. *Id.* On July 20, 2017, Patey assured Edwards that Evergreen would pay for the graphene and requested that Edwards provide a "breakdown of funds needed for [Celtig's] foreseeable future." ECF No. 212–18. On July 24, 2017, Edwards asked for immediate payment for the graphene Celtig had already produced and a timeline of when Evergreen would pick up the graphene. ECF No. 212–19. But Defendants did not respond.

D.  TERMINATION OF THE AGREEMENT

On August 4, 2017, Edwards, pursuant to paragraph four of the Licensing Agreement, *see* ECF No. 212–4 at 7, notified Defendants that Celtig was demanding proof of Evergreen's financial and operational capability to perform, and requested a response within fourteen days. ECF No. 212–20. Edwards' letter stated:

> Celtig needs to know that you are financially capable of acquiring the materials for which you have provided purchase orders, as well as the assurance that Evergreen is currently solvent and will be capable of performing now and in the future. Celtig further requests that you take immediate possession and pay for the graphene ordered by Evergreen and produced by Celtig. Celtig cannot continue to operate as a company if Evergreen is unable and/or unwilling to purchase graphene as required by our agreement, or to otherwise comply with the other requirements of our agreements.

*Id.* at 2–3. On August 18, 2017, Evergreen asked for a two-week extension to provide proof of its financial wherewithal. Edwards agreed to the extension. But two more weeks passed, and Evergreen failed to provide proof of its financial and operational capabilities.

Defendants never sent Celtig assurances of their financial capability to perform under the contract. *See* ECF Nos. 208 at 11; 209 at 7. Defendants also never paid for or took delivery of the 1,000kg of graphene that Celtig produced, which remains in Celtig's production facility in South Carolina. *See* ECF No. 208 at 10. On September 11, 2017, Edwards emailed Patey and informed him that Evergreen was in material breach of the Agreement based on its failure to provide evidence of its financial capabilities and failure to pay for and take delivery of the graphene. ECF No. 212–22. Edwards informed Patey that Celtig was terminating the Agreement. *Id.* On September 14, 2017, Celtig, through counsel, reiterated that it believed Defendants were in breach and that it was terminating the Agreement. ECF No. 212–23. In response, counsel for Defendants sent Celtig a letter threatening suit. ECF No. 212–24. Defendants reiterated this warning in a letter dated September 23, 2017. ECF No. 212–27. Evergreen did not request mediation in either letter.

E. PROCEDURAL HISTORY

On September 26, 2017, Celtig filed suit against Evergreen, RAM, PSDI, and Patey, asserting three claims against all Defendants: Count I, breach of contract; Count II, fraud in the inducement; and Count III, declaratory judgment. On September 30, 2019, the court dismissed Count II with prejudice. *See Celtig*, 2019 WL 4779285, at *9. Under Count III, Plaintiff seeks a declaratory judgment that (1) "Defendants breached the Definitive Agreement by failing to pick up and pay for graphene Evergreen requested pursuant to its Purchase Orders;" (2) "Defendants breached paragraph 4(b) of the Licensing Agreement by failing to provide Celtig with adequate and reasonable assurances of its financial and operational capability to perform timely its obligation under the Licensing Agreement within the time frame to which the parties agreed;" (3) "Defendants' breaches trigger [Celtig's] right to terminate the Agreements under their respective termination provisions;" (4) "Defendants anticipatorily breached and waived the mediation requirement under paragraph 8(b) of the Licensing Agreement by threatening to file suit against Celtig," thus relieving Celtig of any mediation obligation; and (5) "Defendants are financially unable to comply with their obligations under the Definitive and Licensing Agreements rendering them unable to cure their breaches." Sec. Am. Compl. ¶¶ 79–85.

Thereafter, Defendants filed their answer and counterclaims against Celtig, and third-party claims against other persons and entities. *See* ECF No. 23. As a discovery sanction on Defendants, the court has entered orders preventing Patey or his counsel, Michael Davidson, from testifying in this matter and striking all of the Defendants' counterclaims against Celtig, *see* ECF No. 192, and all of the Defendants' third-party claims, *see* ECF No. 190. The court has also twice imposed civil contempt citations on Defendants because of their failure to pay attorney's fees awarded by the court. *See* ECF Nos. 191, 219. Plaintiffs filed this Motion for Summary Judgment on November 26, 2019. ECF No. 207.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Summary judgment on a contract dispute should be granted if the contractual language is unambiguous." *Higby Crane Serv., LLC v. Nat'l Helium, LLC*, 751 F.3d 1157, 1160 (10th Cir. 2014) (citing *Gomez v. Am. Elec. Power Serv. Corp.*, 726 F.2d 649, 651 (10th Cir. 1984)). But "when conflicting evidence is presented such that the ambiguities in a contract could legitimately be resolved in favor of either party, it is for the ultimate finder of fact—not the court on summary judgment—to interpret the contract." *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1215 (10th Cir. 2009). The parties do not dispute that Utah Law governs the interpretation of the Agreement in this case.

## III.    DISCUSSION

Plaintiff contends that Defendants are in material breach of the Agreement for two reasons: (1) Defendants breached their obligation to pay for and pick up the 1,000kg of graphene they had ordered under the Agreement, and (2) Defendants breached their obligation to provide adequate assurances of their ability to perform under the Agreement. *See* ECF No. 207 at 22. Defendants do not refute the factual basis of these alleged breaches, but instead assert that it was Celtig who first breached the Agreement in numerous other ways.[2] The court finds the Agreement is unambiguous

---

[2] Because of Defendants' misconduct during discovery, including failing to appear for properly noticed depositions in November 2018 and January 2019, the court imposed sanctions on the

10

and there remains no genuine dispute of material fact that Defendants breached the Agreement in two respects. Therefore, Plaintiff is entitled to summary judgment on Count I and Count III.

### A. THE AGREEMENT IS UNAMBIGUOUS

In interpreting a contract under Utah law, the court will "look to the writing itself to ascertain the parties' intentions," and will "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *WebBank v. American Gen. Annuity Service Corp.*, 54 P.3d 1139, 1144 (Utah 2002) (internal quotations and citation omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id*. at 1145 (citation omitted). No ambiguity exists where "the language of the contract . . . [is] not susceptible to contrary, tenable interpretations." *Daines v. Vincent*, 190 P.3d 1269, 1277 (Utah 2008) (quoting *WebBank*, 54 P.3d at 1146). When there is no ambiguity as a matter of law, "the meaning of the contract can appropriately be resolved by the court on summary judgment." *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1201 (Utah 1983).

Here, the court has previously ruled that the Definitive Agreement and Licensing Agreement are integrated to form one binding contract. *Celtig, LLC*, 2019 WL 4751918, at *5. The court further rules that the Agreement unambiguously imposes two obligations on Defendants that are relevant to this Motion: (1) based on Defendants' pre-pay order and commitment to buy the graphene Celtig produced during the "ramp-up period," Defendants were required to purchase and take delivery of the 1,000kg of graphene that Celtig produced in June 2017, and (2) Defendants

---

Defendants and entered an order striking all the Defendants' counterclaims against Celtig. *See* ECF No. 192 at 3.

were required to provide adequate and reasonable assurances of their financial and operational capability to timely perform under the Agreement within fourteen days of Celtig's reasonable request. Moreover, the Agreement unambiguously provides the non-breaching party with certain enumerated termination rights in addition to remedies generally available at law or in equity for a breach of contract under Utah law.

Defendants agreed in the Agreement to purchase and take delivery of the graphene that Celtig produced. Paragraph one of the Definitive Agreement required Evergreen to pre-pay $750,015.00 for the purchase of 833,350 grams of graphene from Celtig within three business days following execution of the agreement on March 28, 2017. ECF No. 212–3 at 2. The parties were to agree on the quality standards, tolerances, and specifications for the graphene sold and purchased thereunder, and agreed that the timing of the deliveries would be decided in writing at a later date. *Id.* Under Paragraph five, Defendants promised to "purchase all of output from [Celtig's] production facility during the production ramp-up period" as well as $20,000,000 worth of graphene for the first twelve-month purchase period, $40,000,000 worth of graphene for the second twelve-month period, and $60,000,000 for the third twelve-month purchase period. *Id.* at 3. Under the terms of the Licensing Agreement, Evergreen also repeated its promise that it would "regularly purchas[e] [graphene] from Celtig in sufficient quantities to meet the reasonably anticipated inventory and purchase demand for such." ECF No. 212–4 at 3–4. And the parties agreed that Evergreen would submit a Purchase Order for specified quantities of graphene, for which Evergreen's payment had to be made to Celtig "no later than thirty (30) days following the shipment of order placed" and "if such payment has not been received by Celtig within ten (10) days following its due date, such failure shall be deemed to be an event of default." *Id.* at 6. These provisions unambiguously establish that (1) Celtig would produce an initial, pre-paid supply of

12

graphene for Defendants; (2) Celtig would immediately ramp up production and, during this period, Defendants would purchase the graphene Celtig produced using Purchase Orders; and (3) Celtig would increase production to meet Defendants' three-year purchase commitment of $20,000,000 worth of graphene in the first year, $40,000,000 in the second year, and $60,000,000 in the third year.

The parties also unambiguously agreed that they would provide adequate assurances of their financial and operational capabilities upon reasonable request from the other party. The Licensing Agreement included a provision allowing for termination of the Agreement if the "non-terminating party . . . fails to provide within fourteen (14) days after a request for adequate and reasonable assurance of its financial and operational capacity to perform timely any of its obligations under this Agreement." *Id.* at 7. This provision required Defendants to provide proof of their financial and operational capacity to perform within fourteen days of a reasonable request from Celtig.

Finally, the parties also assented to certain unambiguous termination terms in the Agreement. The parties agreed to several specific termination remedies, but paragraph ten of the Definitive Agreement also states that these enumerated remedies "are in addition to any other remedies available at law or in equity for a breach of this Agreement." *Celtig*, 2019 WL 4751918, at *5. As the court has ruled previously, because the Agreement is integrated, "the parties intended termination terms contained in the Definitive Agreement to be applicable to the Licensing Agreement" and, therefore, "a breach of either agreement would give rise to the termination options available in paragraph ten. Pursuant to that paragraph, the nonbreaching party may seek remedies available under Utah Law." *Id.*

In sum, the court finds the Agreement is unambiguous as a matter of law and rules that: (1) Evergreen is in breach if it failed to pay for and take delivery of the supply of graphene from Celtig, (2) either party is in breach if it failed to provide adequate assurances of its financial and operational wherewithal within fourteen days of a reasonable request from the other party, and (3) in the event of a breach, the non-breaching party is entitled to specific termination rights as well as "other remedies available at law or in equity" for a breach of the Agreement.

### B. DEFENDANTS' BREACHES OF THE AGREEMENT

The court finds that there remain no genuine disputes of material fact concerning Defendants' two breaches of the Agreement. First, Defendants breached the Agreement by failing to fulfill their obligation to pay for and take delivery of the 1,000kg of graphene they ordered under the Agreement. Under Utah law, the rights and remedies available for breach of commercial sales contracts are governed by the Uniform Commercial Code (UCC). *See* UTAH CODE ANN. § 70A-2-102. Under Utah's adoption of the UCC, a seller's "[t]ender" of the contracted-for goods "entitles the seller to [the buyers'] acceptance of the goods and to payment according to the contract." *Id.* § 70A-2-507. The UCC further provides that when a "buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole . . . the aggrieved seller" is entitled to "withhold delivery of such goods," "recover damages for nonacceptance," or "cancel" the agreement. *Id.* § 70A-2-703. Under Utah law, "cancellation" "occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the canceling party also retains any remedy for breach of the whole contract or any unperformed balance." *Id.* § 70A-2-106(4). Utah law also states that "termination" "occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all

14

obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." *Id.* § 70A-2-106(3).

Applied here, Defendants' failure to pay for and take delivery of the graphene according to Defendants' Purchase Order is a material breach of the Agreement that entitles Celtig to cancel the Agreement and seek remedies available at law or equity. There is no genuine dispute that Defendants placed an order for Celtig to supply 1,000kg of graphene under the Agreement, Defendants submitted a Purchase Order for the graphene, Celtig timely produced and presented 1,000kg of graphene for Defendants to take delivery, but Defendants repeatedly failed to pay for or take delivery of the graphene as required by the Agreement and Utah law. To this day, the graphene remains in Celtig's production facility in South Carolina. Thus, it is undisputed that Celtig, as the seller, tendered the graphene that Defendants ordered under the Agreement, but Defendants, as the buyer, "wrongfully reject[ed] or revoke[d] acceptance of goods" and "fail[ed] to make a payment due," which entitles Celtig to "withhold delivery of such goods," "recover damages for nonacceptance," and "cancel" the Agreement. *See id.* § 70A-2-703.

Defendants also breached the Agreement by failing to fulfill their obligation to provide adequate assurances of their ability to perform after Celtig's reasonable request for such assurances. Under the UCC, a party's failure to provide assurances as required in the contract constitutes a material breach and grounds to cancel a contract. Specifically, Utah law states that:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> . . .

15

> (4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

UTAH CODE ANN. § 70A-2-609(1) & (4). If "a rational trier of fact could not conclude that [Defendants] adequately assured the [Plaintiff]" of their ability to comply with the contract, "summary judgment [is] appropriate." *Smargon v. Grand Lodge Partners, LLC*, 288 P.3d 1063, 1070 (Utah Ct. App. 2012).

Here, Defendants committed a material breach of the agreement by failing to respond to Celtig's request for adequate assurances of Defendants' financial and operational capacity to perform. Paragraph four of the Licensing Agreement states in relevant part:

> **a. Term.** The term of this Agreement commences on the Effective Date and continues for a period of ninety-nine years, unless it is earlier terminated for cause pursuant to the terms of this Agreement or applicable law.
>
> **b. Other Cause.** Cause exists where the non-terminating party: . . . (v) fails to provide within fourteen (14) days after a request adequate and reasonable assurance of its financial and operational capability to perform timely any of its obligations under this Agreement.
>
> . . .
>
> **d. Termination date.** Any termination under this Section 4 will be effective upon receipt of written notice of termination or such later date, if any, set forth in such termination notice.

ECF No. 212–4 at 7–8. After Celtig repeatedly expressed concerns about Defendants' financial status and ability to perform under the Agreement through various correspondence in June and July of 2017, *see, e.g.*, ECF Nos. 212–8, 212–13, 212–17, 212–19, Celtig invoked paragraph four to formally demand proof of Defendants' financial and operational capacity to perform, *see* ECF No. 212–20. On behalf of Celtig, Edwards wrote in an email to Defendants on August 4, 2017:

> This letter serves as a formal request that Evergreen provide Celtig with "…adequate and reasonable assurance of its financial and operational capability to perform…" within fourteen days from the date of this request, as provided in paragraph 4(b)(v) of the Exclusive License and Distribution Agreement. Celtig needs to know that you are financially capable of acquiring the materials for which you have provided purchase orders, as well as the assurance that Evergreen is currently solvent and will be capable of performing now and in the future. Celtig further requests that you take immediate possession and pay for the graphene ordered by Evergreen and produced by Celtig. Celtig cannot continue to operate as a company if Evergreen is unable and/or unwilling to purchase graphene as required by our agreement, or to otherwise comply with the other requirements of agreements.
>
> If you are unable to demonstrate that you have the financial and operational capability to perform under the contract, then we request an immediate termination of the agreements, so that Celtig can take the necessary steps to minimize its damages.

*Id.* at 2. Defendants requested a two-week extension to provide the requested assurances and Celtig agreed, *see* ECF No. 212–21, but it is undisputed that Defendants never provided the assurances. Accordingly, on September 11, 2017, Celtig provided Defendants notice of Evergreen's material breaches of the Agreement and that Celtig was terminating the Agreement. *See* ECF No. 212–22. In response, Defendants claimed that Celtig was actually the party in breach of the Agreement and threatened to file suit. *See* ECF Nos. 212–24, 212–25, 212–27.

There is no genuine dispute that Celtig formally requested that Defendants provide adequate assurances of their ability to perform under the Agreement on August 4, 2017, but Defendants never provided these assurances as required by the Agreement. Defendants' failure to provide adequate assurances is a material breach of the Agreement that, under Utah law, constitutes "a repudiation of the contract" enabling Celtig, as the non-breaching party, to seek appropriate remedies. *See* UTAH CODE ANN. § 70A-2-609(4).

In sum, there is no genuine dispute of material fact that Defendants committed two material breaches of the Agreement. First, Defendants breached the Agreement by failing to pay for and take delivery of the 1,000kg of graphene they had ordered under the Agreement. Second, Defendants breached the Agreement by failing to provide adequate assurances of its financial and operational capacity to perform after Celtig's reasonable request. These breaches of the Agreement entitle Celtig to cancel the Agreement, terminate the contractual relationship between Celtig and Defendants, and pursue "remedies available at law or in equity." ECF No. 212–3 at 5.

## IV.  ORDER

For the foregoing reasons, Plaintiff's Motion for Summary Judgment as to Count I and Count III is GRANTED. Following this order, the court will set a scheduling conference to schedule a trial to determine appropriate damages.

Signed September 24, 2020

                                        BY THE COURT:

                                        _____
                                        Jill N. Parrish
                                        United States District Court Judge